# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| G.M.G.,* <br><br> *Petitioner–Plaintiff,* <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, Attorney General of the United States, in her official capacity; KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MARCO RUBIO, Secretary of State, in his official capacity; U.S. STATE DEPARTMENT; PETE HEGSETH, Secretary of Defense, in his official capacity; U.S. DEPARTMENT OF DEFENSE; PATRICIA H. HYDE, in her official capacity as acting Boston Field Office Director for U.S. Immigration and Customs Enforcement; MICHAEL NESSINGER, in his official capacity as the Warden of the Wyatt Detention Facility; <br><br> *Respondents–Defendants.* | Case No. _____ <br><br> **PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

\* Motion for the Petitioner to proceed under pseudonym has been concurrently filed with this habeas petition and complaint.

**INTRODUCTION**

1.      Petitioner-Plaintiff G.M.G. ("Petitioner") is a Venezuelan man in immigration custody at risk of imminent removal under the President's Proclamation invoking the Alien Enemies Act ("AEA").

2.      By its terms, the AEA applies only where the United States is in a "declared war" with a "foreign nation or government," or a "foreign nation or government" has engaged in, or is threatening to engage in, an "invasion" or "predatory incursion" against the "territory of the United States." 50 U.S.C. § 21.

3.      The Proclamation at issue here invoking the AEA is entitled: "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua.[1] It authorizes the "immediate" removal, without notice or judicial review, of noncitizens over the age of fourteen who the government claims are members of the Venezuelan criminal gang Tren de Aragua ("TdA"), excluding lawful permanent residents. It also overrides all the procedural and substantive protection afforded by Congress for noncitizens in immigration proceedings, including protection against the removal to a place where they will face torture.

4.      Although the AEA requires that its invocation be made "public," the Proclamation is dated March 14, 2015, but was not made public until March 15. The government, however, attempted to remove individuals under the Proclamation before it was made public.

5.      The AEA, enacted in 1798, provides the President with wartime authority and has been used only three times in our Nation's history: the War of 1812, World War I and World War II.

6.      It may not be used against a criminal gang or during peacetime.

---

[1] *Available at* https://perma.cc/ZS8M-ZQHJ.

7.       Nonetheless, on March 15, the government removed at least 137 Venezuelan noncitizens under the Proclamation to one of the world's most notorious prisons in El Salvador, where they may remain incommunicado for the rest of their lives according to the Salvadoran President.

8.       These individuals were sent to this brutal prison without any court having had an opportunity to review the threshold questions of whether a criminal gang can be deemed a "foreign government or nation" within the meaning of the AEA, or whether criminal activity and migration can constitute a military "invasion or predatory incursion" of the "territory of the United States;" under the Act.

9.       These individuals were also given no opportunity to contest their designation as members of the TdA gang and therefore did not even fall with the Proclamation. And more and more evidence is emerging that many (perhaps most) of these individuals lacked any ties to the gang and were mistakenly placed under the Proclamation.

10.       That more individuals are not languishing in a Salvadoran prison is the result of a nationwide class Temporary Restraining Order issued by Judge Boasberg in the District of Columbia. *J.G.G. v. Trump*, No. 1:25-cv-766-JEB, 2025 WL 825115, at *1 (D.D.C. Mar. 15, 2025). The D.C. Circuit declined to stay the TRO, *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *1 (D.C. Cir. Mar. 26, 2025), but the Supreme Court vacated the TRO, *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (Apr. 7, 2025). However, the Supreme Court made clear that review was available by habeas, that individuals subjected to the Proclamation are entitled to "due process" and must be given "notice . . . within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Id*.

3

11.     Accordingly, given that Petitioner is no longer protected by the TRO in D.C., he brings this habeas action in light of the Supreme Court's ruling that habeas is the proper mechanism to challenge the Proclamation's application. Although Petitioner has not been given notice yet of his designation, the government has made clear that they believe he is a member of TdA, as discussed in more detail below. The government has further stated that it may give as little as 12 hours' notice to those it designates and, for those who state an intent to file a habeas petition challenging that designation, it will only give 24 hours for that individual to actually file such a petition—all notwithstanding the Supreme Court's express statement that individuals must be given notice adequate to allow them to "actually" seek judicial review.

12.     The Proclamation is unlawful for three principal reasons: the Proclamation (1) fails to satisfy the statutory predicates of the AEA because the TdA is not a "foreign government or nation" not is it involved in a military "invasion or predatory incursions" of the "territory of the United States;" (2) sweeps away the procedural and substantive protections Congress enacted for the protection of noncitizens subject to removal; and (3) provides no notice or opportunity for judicial review to show that an individual is not in fact a member of the TdA and therefore falls wholly outside of the Proclamation.

13.     Multiple judges have already held, in either a preliminary or merits posture, that there is no authority for the government's actions. *See, e.g.*, *J.A.V. v. Trump*, --- F. Supp. 3d ----, No. 1:25-CV-072, 2025 WL 1257450, at *18 (S.D. Tex. May 1, 2025) (Rodriguez, J.) ("the Court concludes that the President's invocation of the AEA through the Proclamation exceeds the scope of the statute and, as a result, is unlawful"); *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *8-10 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring) (AEA predicates of "invasion" or "predatory incursion" not met); *id*. at *13 (Millett, J., concurring) ("The

Constitution's demand of due process cannot be so easily thrown aside."); *D.B.U v. Trump*, No. 1:25-cv-01163, --- F. Supp. 3d ----, 2025 WL 1163530, at *9-12 (D. Colo. Apr. 22, 2025) (Sweeney, J.), *stay pending appeal denied*, No. 25-1164 (10th Cir. Apr. 29, 2025); *G.F.F. v. Trump*, No. 25 Civ. 2886, 2025 WL 1166480, at *1 (S.D.N.Y. Apr. 9, 2025) (Hellerstein, J.), *amended by* 2025 WL 1166911 (S.D.N.Y. Apr. 11, 2025); *J.G.G. v. Trump*, Civ. No. 25-766 (JEB), --- F. Supp. 3d ----, 2025 WL 890401, at *2 (D.D.C. Mar. 24, 2025) (Boasberg, J.).

14.     Nevertheless, the government has twice attempted (once successfully) to remove individuals under the AEA without any meaningful process. First, on March 15, the government secretly loaded people onto planes, published the Proclamation, and removed at least 137 people within hours to a brutal prison in El Salvador. Those removed received no notice of their designation nor any opportunity to contest it. Second, on April 17, the government provided individuals with an English-only notice form that did not inform them of their right to seek judicial review. Hours after distributing the notices, the government loaded people onto buses and drove them towards the airport, only turning around after counsel filed an emergency appeal in the Supreme Court.

15.     This Court's intervention is necessary so that Petitioner is not unlawfully sent to a Salvadoran prison pursuant to the Proclamation, perhaps for the remainder of his life.

16.     Petitioner in this action does not seek release from detention or contest any aspect of his ongoing immigration proceedings.

## JURISDICTION AND VENUE

17.     This case arises under the Alien Enemies Act ("AEA"), 50 U.S.C. §§ 21-24; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.* and its implementing regulations; the Convention Against Torture ("CAT"), *see* Foreign Affairs Reform and

Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112

Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231); the All Writs Act, 28 U.S.C.

§ 1651; and the Fifth Amendment to the U.S. Constitution.

18. This Court has subject matter jurisdiction under 28 U.S.C. § 2241 *et seq*. (habeas

corpus); art. I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause); 28 U.S.C. § 1346 (United

States as defendant); 28 U.S.C. § 1361 (mandamus); and 28 U.S.C. § 1651 (All Writs Act).

19. The Court may grant relief pursuant to 28 U.S.C. § 2241; 28 U.S.C. § 2243; the

Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.; the All Writs Act, 28 U.S.C. § 1651; and

the Court's inherent equitable powers.

20. Venue is proper in this District under 28 U.S.C. § 2241; 28 U.S.C. § 1391(b); and,

28 U.S.C. § 1391(e)(1) because at the time of filing the Petitioner was detained in the

Respondents' custody within the District of Rhode Island; a substantial part of the events and

omissions giving rise to the claim occurred in this district; as warden of the Wyatt Detention

Facility, Respondent Nessinger resides in this district; and Respondents other than Respondent

Nessinger are agencies of the United States or officers of the United States acting in their official

capacity.

## **PARTIES**

### A. **Petitioner-Plaintiff ("Petitioner")**

21. Petitioner G.M.G. is a Venezuelan national who is detained at Wyatt Detention

Facility in Central Falls, Rhode Island. Because of his perceived political opposition, G.M.G.

was repeatedly detained and threatened by state police in Venezuela. In 2023, he entered the

United States with his fiancée and her son, and then was released on his own recognizance. Since

August 2024, G.M.G. has had a pending application for asylum, withholding, and protection

under the Convention Against Torture. He has been working as a barber in Rhode Island. His next hearing is scheduled for May 15, 2025, at the Chelmsford Immigration Court in Massachusetts. G.M.G. was suddenly arrested and detained while he was at work on March 26, 2025. Since he was detained at the Wyatt Detention Facility, officers approached G.M.G. twice to sign documents in English, which he cannot understand; a detainee translated for him and said they were about his tattoos. At a bond hearing on May 1, 2025, DHS argued that he was associated with TdA and hence not eligible for bond as a member of a foreign terrorist organization. DHS has also submitted to the immigration court an I-213 Form that stated G.M.G. has no known criminal history, but identified him as "Member/Active of Tren de Aragua." The immigration judge accepted the government's argument without allowing G.M.G. to testify. However, G.M.G. denies any association with TdA or any other gang. His tattoos are for personal reasons, and he himself fears persecution by the TdA based on his experiences in Venezuela. Because of the government's accusations against him, G.M.G. is at grave risk of being classified as an alien enemy under the AEA, transferred out of the District, and summarily deported under the Proclamation to El Salvador.

**B. Respondents-Defendants ("Respondents")**

22.    Respondent Donald Trump is the President of the United States. He is sued in his official capacity. In that capacity, he issued the Proclamation under the Alien Enemies Act. Injunctive relief is not sought against the President.

23.    Respondent Pamela J. Bondi is the U.S. Attorney General at the U.S. Department of Justice, which is a cabinet-level department of the United States government. She is sued in her official capacity.

24.     Respondent Kristi Noem is the Secretary of the U.S. Department of Homeland Security, which is a cabinet-level department of the United States government. She is sued in her official capacity. In that capacity, Respondent Noem is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103.

25.     Respondent U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government. Its components include Immigration and Customs Enforcement ("ICE"). Respondent DHS is a legal custodian of Petitioner.

26.     Respondent Todd Lyons is the Acting Director of ICE. Respondent Lyons is responsible for ICE's policies, practices, and procedures, including those relating to the detention of immigrants during their removal procedures. Respondent Lyons is a legal custodian of Petitioner. Respondent Lyons is sued in his official capacity.

27.     Respondent ICE is the subagency of DHS that is responsible for carrying out removal orders and overseeing immigration detention. Respondent ICE is a legal custodian of Petitioner.

28.     Respondent Marco Rubio is the Secretary of State at the U.S. Department of State. He is sued in his official capacity.

29.     Respondent U.S. Department of State, which is a cabinet-level department of the United States government.

30.     Respondent Pete Hegseth is the Secretary of Defense, which is a cabinet-level department of the United States government. He is sued in his official capacity. In that capacity, Respondent Hegseth oversees the Department of Defense and acts as the principal defense policy maker and advisor.

31.     Respondent U.S. Department of Defense ("DOD") is a cabinet-level department of the United States federal government.

32.     Respondent Patrcia H. Hyde is the acting director of ICE's Boston Field Office, which is responsible for ICE activities in the New England region, including Wyatt Detention Facility. Respondent Hyde is an immediate legal custodian responsible for the arrest and detention of Petitioner. She is sued in her official capacity.

33.     Respondent Michael Nessinger is the Warden of the Wyatt Detention Facility, which detains individuals suspected of civil immigration violations pursuant to a contract with ICE. Respondent Nessinger is the immediate physical custodian responsible for the detention of Petitioner. He is sued in his official capacity.

## BACKGROUND

**The Alien Enemies Act**

34.     The AEA is a wartime authority enacted in 1798 that grants the President specific powers with respect to the regulation, detention, and deportation of enemy aliens.

35.     The AEA, as codified today, provides that "[w]henever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies." 50 U.S.C. § 21.

36.     The AEA can thus be triggered in only two situations. The first is when a formal declared war exists with a foreign nation or government. The second is when a foreign nation or

government perpetrates, attempts, or threatens an invasion or predatory incursion against the territory of the United States.

37.     To trigger the AEA, the President must make a public proclamation of the declared war, or of the attempted or threatened invasion or predatory incursion. *Id.*

38.     Section 21 of the AEA also provides that noncitizens must be afforded a right of voluntary departure. Only noncitizens who "refuse or neglect to depart" are subject to removal. *Id.* § 21.

39.     Section 22 of the AEA specifies the terms of departure for noncitizens designated as alien enemies. It grants noncitizens the full time to depart as stipulated by any treaty between the United States and the enemy nation, unless the noncitizen has engaged in "actual hostility" against the United States. If no such treaty exists, the President may declare a "reasonable time" for departure, "according to the dictates of humanity and national hospitality." *Id.* § 22.

40.     The Act has been used only three times in American history, all during actual or imminent wartime.

41.     The AEA was first invoked several months into the War of 1812, but President Madison did not use the AEA to remove anyone from the United States during the war.

42.     The AEA was invoked a second time during World War I by President Wilson. Upon information and belief, there were no removals effectuated pursuant to the AEA during World War I.

43.     The AEA was used again during World War II, though it was never used as a widespread method of removal.

44.     On December 7, 1941, after the Japanese invaded Hawaii in the attack on Pearl Harbor, President Roosevelt proclaimed that Japan had perpetrated an invasion upon the territory

of the United States. The president issued regulations applicable to Japanese nationals living in the United States. The next day Congress declared war on Japan.

45.     On the same day, President Roosevelt issued two separate proclamations stating that an invasion or predatory incursion was threatened upon the territory of the United States by Germany and Italy. The president incorporated the same regulations that were already in effect as to Japanese people for German and Italian people. Three days later Congress voted unanimously to declare war against Germany and Italy.

46.     Congress declared war against Hungary, Romania, and Bulgaria on June 5, 1942. Just over a month later, President Roosevelt issued a proclamation recognizing that declaration of war and invoking the AEA against citizens of those countries.

47.     Under these proclamations, the United States infamously interned noncitizens from Japan, Germany, Italy, Hungary, Romania, and Bulgaria (with U.S. citizens of Japanese descent subject to a separate order that did not rely on the AEA).

48.     It was not until the end of hostilities that the President provided for the removal of alien enemies from the United States under the AEA.  On July 14, 1945, President Truman issued a proclamation providing that alien enemies detained as a danger to public peace and safety "shall be subject upon the order of the Attorney General to removal from the United States." The Department of Justice subsequently issued regulations laying out the removal process. *See* 10 Fed. Reg. 12,189 (Sept. 28, 1945). The regulations required, *inter alia*, notice of the removal order to be served on the designated alien enemy and that the alien enemy had thirty (30) days thereafter to depart—during which time they could seek judicial review of the removal order. *Id*.

**Systemic Overhaul of Immigration Law in 1952**

49.     Following the end of World War II, Congress consolidated U.S. immigration laws into a single text under the Immigration and Nationality Act of 1952 ("INA").

50.     The INA, and its subsequent amendments, provide for a comprehensive system of procedures that the government must follow before removing a noncitizen from the United States. The INA now provides the exclusive procedure by which the government may determine whether to remove an individual. 8 U.S.C. § 1229a(a)(3).

51.     In addition to laying out the process by which the government determines whether to remove an individual, the INA also enshrines certain forms of humanitarian protection.

52.     First, the INA provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status," may apply for asylum. 8 U.S.C. § 1158(a)(1). To qualify for asylum, a noncitizen must show a "well-founded fear of persecution" on account of a protected ground, such as race, nationality, political opinion, or religion. 8 U.S.C. § 1101(a)(42)(A).

53.     Second, save for certain limited exceptions, Congress has barred the removal of an individual to a country where it is more likely than not that he would face persecution on one of these protected grounds. 8 U.S.C. § 1231(b)(3). That protection implements this country's obligations under the 1951 Refugee Convention and the 1967 Protocol relating to the Status of Refugees. The relevant form of relief, known as "withholding of removal," requires the applicant to satisfy a higher standard with respect to the likelihood of harm than asylum, but this form of relief is mandatory if the standard is met.

54.     Third, the Convention Against Torture ("CAT") prohibits the government from returning a noncitizen to a country where it is more likely than not that he would face torture. *See* 8 U.S.C. § 1231 note. That protection implements the Foreign Affairs Reform and Restructuring

Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242. As with withholding

of removal, CAT relief also requires the applicant to satisfy a higher standard with respect to the

likelihood of harm than asylum and relief is mandatory if that standard is met. There is no

exception to CAT relief.

**President Trump's Proclamation Invoking the AEA**

55.    On March 14, the President signed the AEA Proclamation at issue here. It

provides that "all Venezuelan citizens 14 years of age or older who are members of TdA [Tren

de Aragua], are within the United States, and are not actually naturalized or lawful permanent

residents of the United States are liable to be apprehended, restrained, secured, and removed as

Alien Enemies." *See* Invocation of the Alien Enemies Act Regarding the Invasion of the United

States by Tren de Aragua (Mar. 15, 2025).[2]

56.    Although the AEA calls for a "public proclamation," 50 U.S.C. § 21, the

administration did not make the invocation public until around 3:53 p.m. EDT on March 15,

despite making extensive preparations and attempts to remove class members under the Act.

57.    The Proclamation claims that the TdA gang is engaged in an invasion and

predatory incursion into the United States, and that the gang should be considered a "foreign

government."

58.    The Proclamation thus states that all Venezuelan citizens ages fourteen or older

alleged to be members of TdA who are not U.S. citizens or lawful permanent residents are alien

enemies.

59.    The Proclamation provides no means or process for individuals to contest that

they are members of the TdA and do not therefore fall within the terms of the Proclamation. Nor

_____

[2] *Available at*: https://perma.cc/ZS8M-ZQHJ.

does it provide individuals with the statutory grace period required under Section 22, during which they can both seek judicial review or arrange their affairs and leave voluntarily. The Proclamation instead invokes the statutory exception to the "reasonable notice" requirement by claiming that the individuals subject to the Proclamation are "chargeable with actual hostility," and pose "a public safety risk."

60.    The government employs a standardized check list, the "Alien Enemy Validation Guide," to determine who is an "alien enemy" subject to the Proclamation. An ICE officer completes the form, tallying points for different categories of alleged TdA membership characteristics.

61.    The checklist's methodology relies on several dubious criteria, including physical attributes like tattoos, hand gestures, symbols, logos, graffiti, and manner of dress. Experts who study the TdA have explained how none of these physical attributes are reliable ways of identifying members of the TdA.

62.    On April 23, 2025, Respondents submitted a declaration in the Southern District of Texas, under seal, with information about the notice process that the government had for individuals designated for removal under the AEA. *See* Sealed Cisneros Decl., *J.A.V. v. Trump*, No. 1:25-cv-072 (S.D. Tex. filed Apr. 23, 2025), ECF No. 45, Exhibit D. That declaration and its accompanying exhibit were unsealed the next day. Oral Order, *J.A.V. v. Trump*, No. 1:25-cv-072 (S.D. Tex. Apr. 24, 2025). The declaration states that individuals are given 12 hours' notice ahead of scheduled removal and that if they express an intent to file a habeas petition, they are given 24 hours to actually file that petition. Cisneros Decl. ¶ 11, *J.A.V. v. Trump*, No. 1:25-cv-072 (S.D. Tex. filed Apr. 24, 2025), ECF No. 49. The notice process is patently inadequate as a matter of due process.

63.    Multiple judges have already found that the Proclamation is likely unlawful.

64.    First, the Proclamation does not satisfy the statutory requirements for proper invocation of the Alien Enemies Act. Tren de Aragua, a criminal organization, is not a nation or foreign government and is not part of the Venezuelan government. The United States is not in a declared war with Venezuela. The United States cannot declare war against Tren de Aragua because it is not a nation. And neither Venezuela nor Tren de Aragua have invaded or threated to invade the United States, nor has either engaged in a "predatory incursion" of the "territory of the United States" within the meaning of the Act. *See J.A.V.*, 2025 WL 1257450, at *18 (Rodriguez, J.); *J.G.G.*, 2025 WL 914682, at *5–10 (Henderson, J., concurring).

65.    The Proclamation also violates the process and protections that Congress has prescribed elsewhere in the country's immigration laws for the removal of noncitizens. Noncitizens subject to the Proclamation are not afforded the procedural or substantive protection under the INA, including under Convention Against Torture.

66.    Moreover, there is no meaningful notice or opportunity for individuals to challenge their designation as alien enemies. There is thus a significant risk that even individuals who do not fall under the terms of the Proclamation will be subject to it. *See J.G.G.*, 2025 WL 890401, at *2 (Boasberg, J.) ("before plaintiffs may be deported, they are entitled to individualized hearings to determine whether the Act applies to them at all"); *D.B.U.*, 2025 WL 1163530, at *12 (Sweeney, J.) ("the Court agrees with Petitioners the notice provided is deficient").

67.    As a result of the Proclamation, countless Venezuelans—including Petitioner— are at imminent risk of removal pursuant to the Proclamation without any hearing or meaningful

review, regardless of the absence of any ties to TdA or the availability of claims for relief from and defenses to removal.

## CAUSES OF ACTION[3]

### FIRST CLAIM FOR RELIEF

#### *Ultra Vires*, Violation of 50 U.S.C. § 21, *et seq.*
#### (All Respondents)

68.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

69.     The AEA does not authorize the removal of noncitizens from the United States absent a "declared war" or a "perpetrated, attempted, or threatened" "invasion or predatory incursion" against the "territory of the United States" into the United States by a "foreign nation or government." *See* 50 U.S.C. § 21.

70.     The Proclamation and its implementation do not satisfy these statutory preconditions.

71.     Additionally, the AEA permits removal only where noncitizens alleged to be "alien enemies" "refuse or neglect to depart" from the United States. 50 U.S.C. § 21. The AEA also requires the government to afford noncitizens alleged to be "alien enemies" sufficient time to settle their affairs and to depart the United States. *See* 50 U.S.C. § 22.

72.     However, Petitioner is at imminent risk of forced removal without being afforded the privilege of voluntary departure, let alone any notice or an opportunity to respond to the designation of alien enemy.

73.     The application of the AEA Process to Petitioner is therefore *ultra vires*.

---

[3] Insofar as a cause of action seeks to enjoin Respondents, Petitioner does not seek such relief against the President.

## SECOND CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1101, *et seq.*
### (All Respondents)

74.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

75.     The INA provides that a removal proceeding before an immigration judge under 8 U.S.C. § 1229a is "the sole and exclusive procedure" by which the government may determine whether to remove an individual, "[u]nless otherwise specified" in the INA. 8 U.S.C. § 1229a(a)(3).

76.     The INA's "exclusive procedure" and statutory protections apply to any removal of a noncitizen from the United States, including removals authorized by the AEA.

77.     The AEA Process creates an alternative removal mechanism outside of the immigration laws set forth by Congress in Title 8.

78.     Because the AEA Process provides for the removal of Petitioner without the procedures specified in the INA, it violates the INA.

## THIRD CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1158, Asylum
### (All Respondents)

79.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

80.     The INA provides, with certain exceptions, that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply

for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1).

81.    Respondents' application of the AEA Process to Petitioner prevents him from applying for asylum in accordance with 8 U.S.C. § 1158(a)(1) and is therefore contrary to law.

## FOURTH CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1231(b)(3), Withholding of Removal
### (All Respondents)

82.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

83.    With certain limited exceptions, the "withholding of removal" statute, INA § 241(b)(3), *codified at* 8 U.S.C. § 1231(b)(3), bars the removal of noncitizens to a country where it is more likely than not that they would face persecution.

84.    Respondents' AEA Process violates the withholding of removal statute because it does not provide adequate safeguards to ensure that Petitioner is not returned to a country where it is more likely than not that he would face persecution. As a result, Respondents' actions against Petitioner are contrary to law.

## FIFTH CLAIM FOR RELIEF

### Violation of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"),
### codified at 8 U.S.C. § 1231 note
### (All Respondents)

85.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

86.    FARRA prohibits the government from returning a noncitizen to a country where it is more likely than not that he would face torture.

87.    Respondents' AEA Process violates FARRA because it does not provide adequate safeguards to ensure that Petitioner is not returned to a country where it is more likely than not that he would face torture. As a result, Respondents' actions against Petitioner are contrary to law.

### SIXTH CLAIM FOR RELIEF

### *Ultra Vires*, Violation of 50 U.S.C. § 22
### (All Respondents)

88.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

89.    The AEA requires that noncitizens whose removal is authorized by the AEA, unless "chargeable with actual hostility, or other crime against the public safety," be allowed the full time stipulated by treaty to depart or a reasonable time in which to settle their affairs before departing. *See* 50 U.S.C. § 22. The Proclamation on its face denies Petitioner any time under Section 22 to settle his affairs, because it declares everyone subject to the Proclamation to be "chargeable with actual hostility" and to be a "danger to public safety."

90.    The government cannot invoke that exception categorically, without individualized assessments. Each noncitizen must specifically be "chargeable with actual hostility" or a crime against public safety to lose eligibility for voluntary departure.

91.    The AEA Process thus contravenes 50 U.S.C. § 22 and is *ultra vires.*

92.    The application of the AEA Process to Petitioner is contrary to law.

### SEVENTH CLAIM FOR RELIEF

### Violation of Due Process Under the Fifth Amendment
### (All Respondents)

93.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

94.     The Due Process Clause of the Fifth Amendment provides in relevant part that: "No person shall be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

95.     In denying Petitioner meaningful procedural protections to challenge his removal, the Proclamation violates due process.

**EIGHTH CLAIM FOR RELIEF**

**Violation of Habeas Corpus**
**(All Respondents)**

96.     Detainees have the right to file petitions for habeas corpus to challenge the legality of their removal under the Proclamation.

97.     The summary removal of Petitioner under the Proclamation violates their right to habeas corpus. *See* 28 U.S.C. § 2241; U.S. Const. art. I, § 9, cl. 2 (Suspension Clause).

**PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully prays this Court to:

a. Assume jurisdiction over this matter;

b. Grant a temporary restraining order to preserve the status quo pending further proceedings;

c. Enjoin Respondents from transferring Petitioner out of this district during the pendency of this litigation;

d. Enjoin Respondents from removing Petitioner pursuant to the Proclamation.

e. Grant a writ of habeas corpus to Petitioner that enjoins Respondents removing him pursuant to the Proclamation;

f.   Declare unlawful the Proclamation;

g.   Enjoin Respondents from applying the Proclamation to Petitioner without providing 30-day notice of and an opportunity to respond to any designation as an alien enemy under the Proclamation prior to the removal date;

h.   Award Petitioner's counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

i.   Grant such further relief as the Court deems just, equitable, and appropriate.

Dated: May 5, 2025

Respectfully submitted,

*/s/ Sonja L. Deyoe*

Lee Gelernt*
Daniel Galindo*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
E: lgelernt@aclu.org
E: dgalindo@aclu.org

My Khanh Ngo*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
E: mngo@aclu.org

Sonja L. Deyoe (#6301)
Cooperating Counsel,
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF RHODE
ISLAND
395 Smith Street
Providence, RI 02908
(401) 864-5877
SLD@the-straight-shooter.com

Lynette Labinger (#1645)
Cooperating Counsel,
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF RHODE
ISLAND
128 Dorrance Street, Box 710
Providence, RI 02903
(401) 465-9565
LL@labingerlaw.com

Attorneys for Petitioner-Plaintiff

*Pro hac vice applications
forthcoming*