**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

G.M.G.,

*Petitioner–Plaintiff*,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

*Respondents–Defendants.*

Case No.   1:25-cv-00195-MRD-PAS

## PETITIONER-PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF A TEMPORARY RESTRAINING ORDER

## <u>INTRODUCTION</u>

Petitioner-Plaintiff ("Petitioner") respectfully requests an immediate Temporary Restraining Order ("TRO") to avoid irreparable harm to Petitioner—and to ensure that this Court is not potentially deprived, permanently, of jurisdiction.

In a Proclamation signed on March 14 and published on March 15, the President invoked a war power, the Alien Enemies Act of 1798 ("AEA"), to summarily remove noncitizens from the U.S. and bypass the immigration laws Congress has enacted. *See* Invocation of the Alien Enemies Act (Mar. 15, 2025) ("Proclamation").[1] The AEA permits the President to invoke the AEA only where the United States is in a "declared war" with a "foreign government or nation" or a 'foreign government or nation" is threatening to, or has engaged in, an "invasion or predatory incursion" against the "territory of the United States." The Proclamation targets Venezuelan noncitizens accused of being part of Tren de Aragua ("TdA"), a criminal gang, and claims that the gang is engaged in an "invasion and predatory incursion" within the meaning of the AEA.

On the evening of March 15, a D.C. District Court issued an order temporarily pausing removals pursuant to the Proclamation for a provisionally certified nationwide class. *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *2 (D.C. Cir. Mar. 26, 2025). The D.C. Circuit denied the government's motion to vacate that TRO. On April 7, in a 5-4 decision, the Supreme Court granted the government's application to vacate the TRO order on the basis that those plaintiffs had to proceed through habeas, without reaching the merits of whether the Proclamation exceeds the President's power under the AEA. In doing so, however, the Court emphasized that individuals who are designated under the AEA Proclamation are "entitle[d] to due process" and notice "within

---

[1] https://perma.cc/ZS8M-ZQHJ.

a reasonable time and in such manner as will allow them to actually seek habeas relief" before removal. *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025).

In light of the Supreme Court's ruling, courts across the country have enjoined removals and transfers of people who are detained in their districts and designated or at risk of imminent designation as alien enemies pursuant to the Proclamation. *See J.A.V. v. Trump*, No. 1:25-CV-072, --- F. Supp. 3d ----, 2025 WL 1257450, at *20 (S.D. Tex. May 1, 2025); *D.B.U. v. Trump*, --- F. Supp. 3d ----, 2025 WL 1163530, *14 (D. Colo. Apr. 22, 2025), *stay denied*, 2025 WL 1233583 (10th Cir. Apr. 29, 2025); *G.F.F. v. Trump*, No. 25-cv-2886, 2025 WL 1166480 (S.D.N.Y. Apr. 9, 2025), *as amended*, 2025 WL 1166911 (Apr. 11, 2025), *extended*, WL 1166450 (S.D.N.Y. Apr. 22, 2025); *A.S.R. v. Trump*, --- F. Supp. 3d ----, 2025 WL 1208275 (W.D. Pa. Apr. 25, 2025); *Sanchez Puentes v. Garite*, --- F. Supp. 3d ---, 2025 WL 1203179 (W.D. Tex. Apr. 25, 2025).

Despite the Supreme Court's clear instructions, the government has since made one other known attempt to remove a large number of individuals under the Proclamation without meaningful notice. From April 17 to 18, the government gave detainees at Bluebonnet Detention Center in Texas an English-only AEA designation form, not provided to any attorney, which nowhere mentioned the right to contest the designation or removal. *See* Emergency Appl. for an Emergency Inj. or Writ of Mandamus at 4–8, *A.A.R.P. v. Trump*, 145 S. Ct. 1034 (Mem.) (filed Apr. 18, 2025). ICE officers told detainees that they would be removed on April 18. *Id.* at 5; *see also* Cisneros Decl., *J.A.V. v. Trump*, No. 1:25-cv-00072 (S.D. Tex. filed Apr. 24, 2025), ECF No. 49-1 (Form AEA-21B). Petitioners' counsel in that case sought relief from the district court, the Fifth Circuit, and the Supreme Court. Vehicles with dozens of Venezuelan men that left the detention facility were turned around after those filings, and the Supreme Court issued a stay on

removals for the putative class in the Northern District of Texas at 12:51 a.m. EDT on Saturday, April 19. *A.A.R.P.*, 145 S. Ct. at 1034.

After that order was entered, Respondents' process for providing notice of AEA designations was made public, although the government sought to keep it under seal. *See* Cisneros Decl., *J.A.V. v. Trump*, No. 1:25-cv-00072 (S.D. Tex., filed Apr. 24, 2025), ECF No. 49 (hereinafter "Cisneros Decl."); *id*. Oral Order (entered at 4:26 PM CT, Apr. 24, 2025) (unsealing the declaration). Detainees must express an intent to file a habeas petition challenging their designation within the first 12 hours or they can be removed; if they express an intent to file a habeas petition, they are given 24 hours to actually file that petition, Cisneros Decl. ¶ 11.

Petitioner has filed this habeas action following the Supreme Court's order that those designated as "alien enemies" must receive due process and the government's subsequent actions to designate individuals as alien enemies and rapidly remove them without meaningful notice. The Proclamation is invalid under the AEA for multiple reasons.

*First*, the Proclamation fails to satisfy the AEA's statutory predicates because TdA is not a "foreign nation or government," nor is TdA is engaged in an "invasion" or "predatory incursion" within the meaning of the AEA. Thus, the government's attempt to summarily remove Venezuelan noncitizens exceeds the wartime authority that Congress delegated. *Second,* the Proclamation violates both the Act and due process by failing to provide notice and a meaningful opportunity for individuals to challenge their designation as alien enemies. *Third*, the Proclamation violates the process and protections that Congress has prescribed for the removal of noncitizens in the immigration laws, including protection against being sent to a country where they will be tortured.

**Accordingly, Petitioner moves the Court for a TRO for barring his summary removal under the AEA and barring Respondents from relocating him outside of this District pending**

**this litigation.[2] Upon information and belief, his transfer for removal is imminent because he was just denied bond in immigration court based on the government's accusation of TdA membership.** Immediate intervention by this Court is required given that the vacatur of the D.C. district court's TRO no longer protects him and the government's policy to provide a mere 12 hours' notice ahead of removal and 24 hours to file a habeas petition. And if there is an unlawful removal, the government has taken the position that the courts would lose jurisdiction and there would be no way to correct any erroneous removal. Indeed**,** in the government's rush to transfer individuals to El Salvador, the government has mistakenly deported at least one Salvadoran man without legal basis and claims that individual cannot be returned. *See Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (Apr. 10, 2025). At least one other individual was removed to El Salvador on March 15 in violation of a binding settlement agreement. *J.O.P. v. U.S. DHS*, 2025 WL 1180191 (D. Md. Apr. 23, 2025). Declarations and news accounts suggest that many, if not most, of the alleged TdA members sent to El Salvador pursuant to the Proclamation at issue here were not in fact TdA members. *See* Pls.' Mot. for Prelim. Inj., *J.G.G.*, No. 25-cv-766-JEB (D.D.C. Mar. 28, 2025), EF No. 67-1 at 3–7 (describing accounts and evidence of individuals without ties to TdA).

The TRO sought here does *not* seek to prohibit the government from prosecuting any individual who has committed a crime. Nor does it seek release from immigration detention or to prohibit the government from removing any individual who may lawfully be removed under the immigration laws.

---

[2] Petitioner does not seek to enjoin the President but the President remains a proper respondent because, at a minimum, Petitioner may obtain declaratory relief against him. *See, e.g.*, *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (concluding that court had jurisdiction to issue writ of mandamus against the President but "opt[ing] instead" to issue declaration).

## LEGAL AND FACTUAL BACKGROUND

### I.    The Alien Enemies Act

The AEA is a wartime authority that grants the President specific powers with respect to the regulation, detention, and deportation of enemy aliens. Passed in 1798, the AEA, as codified today at 50 U.S.C. § 21, provides:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies.

This Act has been used only three times in the country's history and each time in a period of war—the War of 1812, World War I, and World War II.

The Act also provides that individuals designated as enemy aliens will generally have time to "settle affairs" before removal and the option to voluntarily "depart."[3] *See, e.g.*, *United States ex rel. Dorfler v. Watkins*, 171 F.2d 431, 432 (2d Cir. 1948) ("An alien must be afforded the privilege of voluntary departure before the [AG] can lawfully remove him against his will.").

### II.    Congress's Comprehensive Reform of Immigration Law

Following World War II, Congress consolidated U.S. immigration laws into a single text under the Immigration and Nationality Act of 1952 ("INA"). The INA, and its subsequent amendments, provide a comprehensive system of procedures that the government must follow

---

[3] 50 U.S.C. § 21 (providing for removal of only those "alien enemies" who "refuse or neglect to depart" from the U.S.); *id.* § 22 (granting time for departure in accordance with treaty stipulation or "where no such treaty exists, or is in force," a "reasonable time as may be consistent with the public safety, and according to the dictates of humanity and national hospitality").

before removing a noncitizen from the U.S. *See* 8 U.S.C. § 1229a(a)(3) (INA provides "sole and exclusive procedure" for determining whether noncitizen may be removed).

As part of that reform and other subsequent amendments, Congress prescribed safeguards for noncitizens seeking protection from persecution and torture. These protections codify the humanitarian framework adopted by the United Nations in response to the humanitarian failures of World War II. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 439-40 (1987); *Aliyev v. Mukasey*, 549 F.3d 111, 118 n.8 (2d Cir. 2008) ("It is no accident that many of our asylum laws sprang forth as a result of events in 1930s Europe."). First, the asylum statute, 8 U.S.C. § 1158, provides that any noncitizen in the U.S. has a right to apply for asylum. Second, the withholding of removal statute, 8 U.S.C. § 1231(b)(3), provides that noncitizens "may not" be removed to a country where their "life or freedom" would be threatened based on a protected ground. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999) (withholding is mandatory upon meeting statutory criteria). Third, protections under the Convention Against Torture ("CAT") prohibit returning noncitizens to a country where it is more likely than not that they would face torture. *See* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") § 2242(a), Pub. L. No. 105-207, Div. G. Title XXI, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note); 8 C.F.R. § 1208.16-.18.

## III.    The AEA Proclamation and the Unlawful Removals

On March 14, the President signed the AEA Proclamation at issue here. It provides that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *See* Proclamation. Although the AEA calls for a "public proclamation," 50 U.S.C. § 21, the administration did not make the invocation public until around 3:53 p.m. on March 15. As set forth more fully in Judge

Boasberg's opinion, even prior to the Proclamation's publication, the government sought to remove individuals. *J.G.G. v. Trump*, No. 1:25-cv-766-JEB (D.D.C. Mar. 18, 2025), ECF No. 28-1 (Cerna Decl.) ¶ 5; *J.G.G.*, 2025 WL 890401, at *3 (D.D.C. Mar. 24, 2025) (noting that prior to publication of Proclamation, and after a lawsuit was filed against the removals, it appeared that "the Government . . . was nonetheless moving forward with its summary-deportation plans.").

In addition to claiming that a *criminal gang* during *peacetime* satisfies the AEA's statutory predicates, the Proclamation does not provide any process for individuals to contest that they are members of the TdA and do not therefore fall within the terms of the Proclamation. The Proclamation also supplants the removal process under the congressionally enacted immigration laws, which, among other things, provide a right to seek protection from persecution and torture. *See, e.g.*, 8 U.S.C. §§ 1158, 1231(b)(3), 1231 note.

To date, at least 137 Venezuelan men have been removed under the Proclamation and are now in El Salvador in one of the most notorious prisons in the world, possibly for the rest of their lives. Whether most (or perhaps all) of that group lacks ties to TdA remains to be seen, because Respondents secretly rushed the men out of the country and have provided no information about them. But evidence since these individuals were sent to El Salvador flights on March 15 increasingly shows that many were not "members" of TdA. *See J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-21 (Sarabia Roman Decl., Exhs. 4-20) (media reports regarding evidence contradicting gang allegations). Such false accusations are particularly devastating given Petitioner's strong claims for relief under our immigration laws. *See* Fuchs Decl. ¶ 3.

The government's errors are unsurprising, given the methods it is employing to identify members of TdA. The "Alien Enemy Validation Guide" that the government has used to ascertain alien enemy status, requires ICE officers to tally points for different categories of alleged TdA

membership characteristics. *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-21 (Sarabia Roman Decl., Exh. 1). The guide relies on a number of dubious criteria, including physical attributes like "tattoos denoting membership/loyalty to TDA" and hand gestures, symbols, logos, graffiti, or manner of dress. But experts who study the TdA have explained how none of these physical attributes are reliable ways of identifying gang members. *Id.* at 67-3 (Hanson Decl.) ¶¶ 22-24, 27; *id.* at 67-4 (Antillano Decl.) ¶ 14; *id.* at 67-12 (Dudley Decl.) ¶ 25.

Experts on El Salvador have also explained how those removed there face grave harm and torture at the Salvadoran Terrorism Confinement Center ("CECOT"), including electric shocks, beating, waterboarding, and use of implements of torture on detainees' fingers. *See J.G.G.*, 145 S. Ct. at 1010–11 (Sotomayor, J., dissenting) ("inmates in Salvadoran prisons are highly likely to face immediate and intentional life-threatening harm at the hands of state actors (internal quotation marks omitted)); *see also J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 44-4 (Bishop Decl.) ¶¶ 21, 33, 37, 39, 41; *id.* at 44-3 (Goebertus Decl.) ¶¶ 8, 10, 17. These abusive conditions are life threatening, as demonstrated by the hundreds of people who have died in Salvadoran prisons. *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 44-3 (Goebertus Decl.) ¶ 5; *id.* at 44-4 (Bishop Decl.) ¶¶ 43–50. Worse, those removed and detained at CECOT face indefinite detention. *Id.* at 44-3 (Goebertus Decl.) ¶ 3 (quoting the Salvadoran government that people held in CECOT "will never leave"); Nayib Bukele, X.com post (Mar. 16, 2025, 5:13AM ET) (detainees "were immediately transferred to CECOT . . . for a period of one year (renewable)").[4]

## IV.    Petitioner

Petitioner G.M.G. is a Venezuelan national who is detained at Wyatt Detention Facility in Central Falls, Rhode Island. Fuchs Decl. ¶ 7. Because of his perceived political opposition, G.M.G.

---

[4] https://perma.cc/52PT-DWMR.

was repeatedly detained and threatened by state police in Venezuela. *Id*. ¶ 3. In 2023, he entered the United States along with his fiancée and her son, and then was released on his own recognizance. *Id*. ¶ 4. Since August 2024, G.M.G. has had a pending application for asylum, withholding, and protection under the Convention Against Torture. *Id*. ¶ 5. He has been working as a barber in Rhode Island. *Id*. G.M.G.'s next hearing is scheduled for May 15, 2025, at the Chelmsford Immigration Court in Massachusetts. *Id*. ¶ 15. G.M.G. was suddenly arrested and detained while he was at work on March 26, 2025. *Id*. ¶ 6. Since he was detained at the Wyatt Detention Facility, officers approached G.M.G. twice to sign documents in English, which he cannot understand; a detainee translated for him and said they were about his tattoos. *Id*. ¶¶ 8–9. At a bond hearing on May 1, 2025, DHS argued that he was associated with TdA and hence not eligible for bond as a member of a foreign terrorist organization. *Id*. ¶ 12. DHS has also submitted to the immigration court an I-213 Form that stated G.M.G. has no known criminal history, but identified him as "Member/Active of Tren de Aragua." *Id*. ¶ 11. The immigration judge accepted the government's argument without allowing G.M.G. to testify. *Id*. ¶ 12. However, G.M.G. denies any association with TdA or any other gang. *Id*. ¶ 13. His tattoos are for personal reasons, *id*., and he himself fears persecution by the TdA based on his experiences in Venezuela. *Id*. ¶¶ 3, 17. Because of the government's accusations against him, G.M.G. is at grave risk of being classified as an alien enemy under the AEA and summarily deported under the Proclamation to El Salvador. *Id*. ¶¶ 1, 16.

Upon information and belief, the government transfers individuals from the Wyatt Detention Facility once they have been denied release on bond—often overnight and without any notice to immigration counsel. *Id*. ¶ 15. Over the last few weeks, the government has once again transferred dozens of individuals like G.M.G. (accused of TdA membership) from diverse

detention centers around the country, despite their pending immigration court proceedings in places like Louisiana, Minnesota and California, and tried to remove them en masse out of northern Texas without meaningful notice or opportunity to respond. *See supra*.   Petitioner fears that because he was just denied bond in immigration court on May 1, and the government has accused him of being a member of TdA, he is at imminent risk of being transferred out of this District for summary removal. Fuchs Decl. ¶¶ 1, 15–17.

**LEGAL STANDARD**

To obtain a TRO, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); *see NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020); *New York v. Trump*, No. 25-CV-39-JJM-PAS, --- F. Supp. 3d ----, 2025 WL 715621, at *5 (D.R.I. Mar. 6, 2025), *stay denied*, 133 F.4th 51 (1st Cir. 2025).

**ARGUMENT**

**I.    Petitioner Is Likely to Succeed on the Merits.**

**A.    The Proclamation Does Not Satisfy the AEA.**

The Proclamation is unprecedented, exceeding the President's statutory authority in three critical respects: there is no invasion or predatory incursion; no foreign government or nation; and no process to contest whether an individual falls within the Proclamation. When the government asserts "an unheralded power" in a "long-extant statute," courts "greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

That skepticism is well warranted here. As Judge Henderson stressed in denying the government's request for a stay of a TRO, a gang's criminal activities do not constitute an

"invasion or predatory incursion" under the AEA and the Act is a wartime authority meant to address "military" attacks. *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *1-13 (D.D.C. Mar. 26, 2025). And in granting a permanent injunction against removals out of the Southern District of Texas, Judge Rodriguez recently held that "the Proclamation's language cannot be read as describing conduct that falls within the meaning of 'invasion'" or "predatory incursion" within the AEA. *J.A.V.*, 2025 WL 1257450, at *18; *see also D.B.U.*, 2025 WL 1163530, at *9–12 (finding "invasion," "predatory incursion and "foreign nation or government" not met for purposes of AEA).

### 1.  There Is No "Invasion" or "Predatory Incursion" upon the United States.

The Proclamation fails, on its face, to satisfy an essential statutory requirement: that there be an "invasion or predatory incursion" directed "against the territory of the United States." The text and history of the AEA make clear that it uses these terms to refer to military actions indicative of an actual or impending war. At the time of enactment, an "invasion" was a large-scale military action by an army intent on territorial conquest. *See* Webster's Dict., *Invasion* (1828) ("invasion" is a "hostile entrance into the possession of another; particularly, the entrance of a hostile army into a country for purpose of conquest or plunder, or the attack of a military force"); *see also J.G.G.*, 2025 WL 914682, at *20 (in the Constitution, "invasion "is used in a military sense" "*in every instance*"); *J.A.V.*, 2025 WL 1257450, at *16 ("the plain, ordinary meaning of 'invasion' was an entry into the nation's territory by a military force or an organized, armed force, with the purpose of conquering or obtaining control over territory"). And "predatory incursion" referred to smaller-scale military raids aimed to destroy military structures or supplies, or to otherwise sabotage the enemy, often as a precursor to invasion and war. *See* Webster's Dict., *Incursion* (1828) ("incursion . . . applies to the expeditions of small parties or detachments of an enemy's

army, entering a territory for attack, plunder, or destruction of a post or magazine"); *J.G.G.*, 2025 WL 914682, at *10 ("predatory incursion" is "a form of hostilities against the United States by another nation-state, a form of attack short of war"); *J.A.V.*, 2025 WL 1257450, at *16 ("the common usage of 'predatory incursion' . . . referenced a military force or an organized, armed force entering a territory to destroy property, plunder, and harm individuals, with a subsequent retreat from that territory"). The interpretive canon of *noscitur a sociis* confirms that the AEA's powers extended beyond an existing war only when war was imminent. *Ludecke*, 335 U.S. at 169 n.13 ("the life of [the AEA] is defined by the existence of a war"). Reading "invasion" and "predatory incursion" in light of the neighboring term, "declared war," highlights the express military nature of their usage here. *See Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961).

The historical context in which the AEA was passed reinforces what Congress meant by "predatory incursion" and "invasion." At the time of passage, French ships were already attacking U.S. merchant ships in U.S. *See, e.g.*, 7 Annals of Cong. 58 (May 1797) (promoting creation of a Navy to "diminish the probability of . . . predatory incursions" by French ships while recognizing that distance from Europe lessened the chance of "invasion"); Act of July 9, 1798, ch. 68, 1 Stat. 578, 578 (authorizing US ships to seize "any armed French vessel" "found within the jurisdictional limits of the United States"). Congress worried that these attacks against the territory of U.S. were the precursor to all-out war with France. *J.G.G.*, 2025 WL 914682, at *1 ("In 1798, our fledgling Republic was consumed with fear . . . of external war with France."). This "predatory violence" by a sovereign nation led, in part, to the AEA. *See* Act of July 7, 1798, ch. 67, 1 Stat. 578, 578

13

("[W]hereas, under authority of the French government, there is yet pursued against the United States, a system of predatory violence").[5]

"Mass illegal migration" or criminal activities, as described in the Proclamation, plainly do not fall within the statutory boundaries. On its face, the Proclamation makes no findings that TdA is acting as an army or military force. Nor does the Proclamation assert that TdA is acting with an intent to gain a territorial foothold in the U.S. for military purposes. And the Proclamation makes no suggestion that the U.S. will imminently be at war with Venezuela. The oblique references to the TdA's ongoing "irregular warfare" within the U.S. do not suffice because the Proclamation makes clear that that term is referring to "mass illegal migration" and "crimes"—neither of which constitute war within the Founding Era understanding. It asserts that TdA "commits brutal crimes" with the goal of "harming United States citizens, undermining public safety, and . . . destabilizing democratic nations." But these actions are not "against the territory" of the U.S. Indeed, if mass migration or criminal activities by some members of a particular nationality could qualify as an "invasion," then virtually any group, hailing from any country, could be deemed enemy aliens. *See J.G.G.*, 2025 WL 914682, at *10 (observing that "[m]igration alone [does] not suffice" to establish an "invasion" or "predatory incursion under the AEA).

### 2. The Purported Invasion Is Not by a "Foreign Nation or Government."

The Proclamation also fails to assert that any "foreign nation or government" within the meaning of the Act is invading the United States. Put simply, the Proclamation never finds that

---

[5] At the same time, the 1798 Congress authorized the President to raise troops "in the event of a declaration of war against the U.S., or of an actual invasion of their territory, by a foreign power, or of imminent danger of such invasion." Act of May 28, 1798, ch. 47, 1 Stat. 558. As Judge Henderson noted, "[t]his language bears more than a passing resemblance to the language of the AEA, which Congress enacted a mere thirty-nine days later. *J.G.G.*, 2025 WL 914682, at *9. As such, the historical context makes plain that Congress was concerned about *military* incursions by the armed forces of a foreign nation that constitute or imminently precede acts of war.

TdA is a foreign "nation" or "government." Instead, the Proclamation asserts that "[o]ver the years," the Venezuelan government has "ceded ever-greater control over their territories to transnational criminal organizations." But the Proclamation notably does *not* say that TdA operates as a government in those regions. In fact, the Proclamation does not even specify that TdA currently controls *any* territory in Venezuela.

Moreover, when a "nation or government" is designated under the AEA, the statute unlocks power over that nation or government's "natives, citizens, denizens, or subjects." 50 U.S.C. § 21. *Countries* have "natives, citizens, denizens, or subjects." By contrast, criminal organizations, in the Proclamation's own words, have "members." Proclamation § 1 ("members of TdA"). And it designates TdA "members" as subject to AEA enforcement—but "members" are not "natives, citizens, denizens, or subjects." That glaring mismatch underscores that Respondents are attempting not only to use the AEA in an unprecedented way, but also in a way that Congress never permitted—as a mechanism to address, in the government's own words, a *non*-state actor. *Venezuela* has natives, citizens, and subjects, but TdA (not Venezuela) is designated under the Proclamation.[6] Even as the Proclamation singles out certain Venezuelan nationals, it does not claim that *Venezuela* is invading the United States. And, as the President's own CIA Director recently testified, the intelligence community has no assessment that says the U.S. is at war with or being invaded by Venezuela. Ryan Goodman, Bluesky (Mar. 26, 2025).[7] The AEA requires the

---

[6] Moreover, the AEA presumes that a designated nation possesses treaty-making powers. *See* 50 U.S.C. § 22 ("stipulated by any treaty . . . between the United States and the hostile nation or government"). Nations—not criminal organizations—are the entities that enter into treaties. *See, e.g.*, *Medellin v. Texas*, 552 U.S. 491, 505, 508 (2008) (treaty is "a compact between independent nations" and "agreement among sovereign powers"); *Holmes v. Jennison*, 39 U.S. 540, 570-72 (1840) (similar).

[7] https://bsky.app/profile/rgoodlaw.bsky.social/post/3llc4wzbkr22k (Q: "Does the intelligence community assess that we are currently at war or being invaded by the nation of Venezuela?" A: "We have no assessment that says that.").

President to identify a "foreign nation or government" that is invading or engaging in an invasion or incursion. Because it does not, the Proclamation fails on its face. *See D.B.U.*, 2025 WL 1163530, at *11 ("the Proclamation fails to adequately find or assert TdA is a 'foreign nation or government'").

Further, the AEA's historical record confirms that it was intended to address conflicts with foreign sovereigns, not criminal gangs like TdA. *See* 5 Annals of Cong. 1453 (Apr. 1798) ("[W]e may very shortly be involved in war[.]"); John Lord O'Brian, Special Ass't to the Att'y Gen. for War Work, Civil Liberty in War Time, at 8 (Jan. 17, 1919) ("The [AEA] was passed by Congress . . . at a time when it was supposed that war with France was imminent."); Jennifer K. Elsea & Matthew C. Weed, Cong. Rsch. Serv., RL3113, Declarations of War and Authorizations for the Use of Military Force 1 (2014) (Congress has never issued a declaration of war against a nonstate actor). If Respondents were allowed to designate any group with ties to officials as a foreign government, and courts were powerless to review that designation, any group could be deemed a government, leading to an untenable and overbroad application of the AEA.

The Proclamation half-heartedly attempts to link TdA to Venezuela by suggesting only that TdA is "supporting," "closely aligned with," or "has infiltrated" the Maduro regime. *See* Proclamation. But those characterizations, even if accepted, are insufficient to establish that a "foreign government or nation" is itself invading the United States. Thus, this court need not go beyond the face of the Proclamation to find that it fails to satisfy the statutory preconditions of the AEA. In any event, experts are in accord that it is "absolutely implausible that the Maduro regime controls TdA or that the Maduro government and TdA are intertwined." *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-3 (Hanson Decl.) ¶17; *id.* at 67-4 (Antillano Decl.) ¶ 13; *id.* at 67-12 (Dudley Decl.) ¶¶ 2, 21. As one expert who has done numerous projects for the U.S. government, including

on the topic of TdA, explained, the Proclamation's characterization of the relationship between the Venezuelan state and TdA with respect to TdA's activities in the United States is "simply incorrect." *Id.* at 67-12 (Dudley Decl.) ¶¶ 5, 17-18. The President's own intelligence agencies reached that same conclusion prior to his invocation of the AEA. *See id.* at 67-21 (Sarabia Roman Decl., Exh. 19) ("shared judgment of the nation's spy agencies" is "that [TdA] was not controlled by the Venezuelan government").

> **B.    Summary Removals Without Notice, a Meaningful Opportunity to Challenge "Alien Enemy" Designations, or the Right of Voluntary Departure Violate the AEA and Due Process.**

As the Supreme Court has now made clear, the government must provide Petitioner notice "within a reasonable time and in such a manner as will allow them to actually seek" relief from summary removals under the Proclamation. *J.G.G.*, 2025 WL 102409, at *2 ("detainees subject to removal orders under the AEA are entitled to notice and an opportunity to challenge their removal.").

Despite these clear instructions, it has been revealed that the government has adopted a wholly inadequate notice process. It has created an English-only "notice" of "alien enemy" designation, which does not indicate there is a right to challenge the designation or even consult with an attorney. Cisneros Decl. at 5. The government maintains this document need only be given 12 hours before removal to satisfy the Supreme Court's command for due process and "reasonable time." The government believes it may proceed with removal after 12 hours, unless a person "indicate[s] or express[es] an intent to file a habeas petition." *Id.* ¶ 11. If a person who indicates such an intent "does not file such a petition within 24 hours, then ICE may proceed with the removal." *Id.* Furthermore, even when a person *does* file such a petition, the government *still* does not agree to wait for those proceedings to conclude before removal *absent a TRO from the*

*reviewing court. Id.* ¶ 12 ("Although there may be fact-specific exceptional cases, in a general case, ICE will not remove under the AEA an alien who has filed a habeas petition while that petition is pending. However, ICE may reconsider that position in cases where a TRO has been denied and the habeas proceedings have not concluded within a reasonable time.").

"'It is well established that the Fifth Amendment entitles [noncitizens] to due process of law' in the context of removal proceedings." *J.G.G.*, 145 S. Ct. at 1006. This notice process appears designed to deprive designated individuals of a meaningful opportunity to challenge their designations. The timeframe alone makes it effectively impossible to challenge an AEA designation without an attorney given the constraints on accessing the courts from detention. And the government will only pause removal plans if a designated individual says they would like to file "habeas," an esoteric legal proceeding that is not mentioned by name anywhere on the notice. For represented individuals, including Petitioner, there is apparently no requirement that such notice to be served on counsel.

At a minimum, the notice must be translated into a language that individuals can understand (for Petitioner, Spanish). Most importantly, there must be sufficient time for individuals to seek review and seek judicial review, if they choose. As during World War II, that notice must be at least 30 days in advance of any attempted removal. And it must be provided to undersigned counsel so that no individual is mistakenly removed. *See*, *e.g.*, *Abrego Garcia*, 145 S. Ct. at 1018.

## C.    The Proclamation Violates the Specific Protections that Congress Established for Noncitizens Seeking Humanitarian Protection.

The Proclamation is unlawful for an independent reason: it overrides statutory protections for noncitizens seeking relief from torture by subjecting them to removal without meaningful consideration of their claims. Congress codified the U.N. Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT") to ensure that noncitizens have

meaningful opportunities to seek protection from torture. *See* 8 U.S.C. § 1231 note; C.F.R. §§ 208.16-.18. CAT categorically prohibits returning a noncitizen to any country where they would more likely than not face torture. 8 U.S.C. §1231 note. CAT applies regardless of the mechanism for removal. The D.C. Circuit recently addressed a similar issue in *Huisha-Huisha v. Mayorkas*, reconciling the Executive's authority under a public-health statute, 42 U.S.C. § 265, with CAT's protections. 27 F.4th 718 (D.C. Cir. 2022). Because § 265 was silent about where noncitizens could be expelled, and CAT explicitly addressed that question, the court held no conflict existed. *Id.* Both statutes could—and therefore must—be given effect. *Id.* at 721, 731-32. This case is on all fours with *Huisha-Huisha,* because the AEA and CAT must be harmonized by applying CAT's protections to AEA removals. Despite this clear statutory framework, the Proclamation overrides all of the INA's protections and deprives those designated under the Proclamation with any opportunity to seek protection against being sent to a place where they will be tortured. *See J.G.G.*, 2025 WL 890401, at *15 ("CAT could stand as an independent obstacle" to "potential torture should Plaintiffs be removed to El Salvador and incarcerated there.")

The AEA can similarly be harmonized with other subsequently enacted statutes specifically designed to protect noncitizens seeking asylum and withholding. *See* Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) (asylum and withholding); 8 U.S.C. §§ 1158 (asylum), 1231(b)(3) (withholding of removal). Congress has unequivocally declared that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1). Likewise, the withholding of removal statute explicitly bars returning a noncitizen to a country where their "life or freedom" would be threatened based on a protected ground. *Id.* § 1231(b)(3)(A). These humanitarian protections were enacted in the aftermath of World War II, when the United States joined other

countries in committing to never again turn our backs on people fleeing persecution and torture. Sadako Ogata, U.N. High Comm'r for Refugees, Address at the Holocaust Memorial Museum (Apr. 30, 1997).[8] A President invoking the AEA cannot simply sweep away these protections.

### D. The Proclamation Violates the Procedural Requirements of the INA

Since the last invocation of the AEA more than 80 years ago, Congress has carefully specified the procedures by which noncitizens may be removed. The INA leaves little doubt that its procedures must apply to every removal, unless otherwise specified by that statute. It directs: "Unless otherwise specified in this chapter," the INA's comprehensive scheme provides "the sole and exclusive procedure for determining whether an alien may be . . . removed from the United States." 8 U.S.C. § 1229a(a)(3); *see also United States v. Tinoso*, 327 F.3d 864, 867 (9th Cir. 2003) ("Deportation and removal must be achieved through the procedures provided in the INA."). Indeed, Congress intended for the INA to "supersede all previous laws with regard to deportability." S. Rep. No. 82-1137, at 30 (Jan. 29, 1952).[9]

Congress was aware that alien enemies were subject to removal in times of war or invasion when it enacted the INA. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (courts presume Congress drafts statutes with full knowledge of existing law). Indeed, the AEA was invoked just a few years before passage of the 1952 INA. With this awareness, Congress provided that the INA contains the "sole and exclusive" procedures for removal and declined to carve out AEA removals from standard immigration procedures, even as it expressly excepted other groups of noncitizens,

---

[8] https://perma.cc/X5YF-K6EU.

[9] One of the processes otherwise specified in the INA is the Alien Terrorist Removal Procedure at 8 U.S.C. § 1531 *et seq.* The Attorney General may opt to use this when she has classified information that a noncitizen is an "alien terrorist." *Id.* § 1533(a)(1). But even that process requires notice, a public hearing, provision of counsel for indigents, opportunity to present evidence, and individualized review by an Article III judge. *Id.* §§ 1532(a), 1534(a)(2), (b), (c)(1)-(2).

including those who pose security risks. *See, e.g.*, 8 U.S.C. § 1531 *et seq.* (establishing fast-track proceedings for noncitizens posing national security risks). By ignoring the INA's role as the "sole and exclusive" procedure for determining whether a noncitizen may be removed, the Proclamation unlawfully bypasses the mandated congressional scheme and usurps Congress's Article I power in the process.

## II.    Petitioner Faces Imminent Irreparable Harm.

In the absence of a TRO, Petitioner—who is detained and whom Respondents have already alleged, incorrectly, to be an active member of TdA—is at imminent risk of summary removal to places, such as El Salvador, where he faces life-threatening conditions, persecution, and torture. *See supra*; *J.G.G.*, 2025 WL 1024097, at *5 (Sotomayor, J., dissenting) ("[I]nmates in Salvadoran prisons are 'highly likely to face immediate and intentional life-threatening harm at the hands of state actors.'"); *see also D.B.U.*, 2025 WL 1163530, at *13 ("Absent a TRO, Petitioner faces the risk of being deported—perhaps wrongfully deported—under the Act and Proclamation in violation of their constitutional rights."). That easily constitutes irreparable harm. *See Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 381 (D. Mass. 2020) ("A finding of irreparable harm . . . most often exists where a party has no adequate remedy at law." (citations omitted)); *D.V.D. v. U.S. Dep't of Homeland Sec.*, No. CV 25-10676-BEM, 2025 WL 1142968, at *23 (D. Mass. Apr. 18, 2025) ("It is undoubtedly '"irreparable injury to reduce to a shell game the basic lifeline of due process before an unprecedented and potentially irreversible removal occurs.'" (citing *J.G.G.*, 2025 WL 914682, at *30 (Millett, J., concurring))); *Antonio v. Garland*, 38 F.4th 524, 527 (6th Cir. 2022) (irreparable harm where petitioner faced likely torture if removed); *Huisha-Huisha*, 27 F.4th at 733 (irreparable harm exists where petitioners "expelled to places where they will be persecuted or tortured"); *see also J.G.G.*, 2025 WL 890401, at *16 ("[T]he risk of torture, beatings,

and even death clearly and unequivocally supports a finding of irreparable harm" if Venezuelans are removed under the AEA Proclamation to El Salvador).

And Petitioner may never get out of these prisons, particularly considering the government's position that once it sends a person to CECOT, even though detention there continues at the government's request, the government is powerless to secure their release and return. *See J.G.G.*, 145 S. Ct. at 1101 (Sotomayor, J., dissenting) (noting government's position that "even when it makes a mistake, it cannot retrieve individuals from the Salvadoran prisons to which it has sent them"); *Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112, at *2 (4th Cir. Apr. 17, 2025) ("both the United States and the El Salvadoran governments disclaim any authority and/or responsibility to return" unlawfully removed noncitizen); *Arguelles v. U.S. Att'y Gen.*, 661 F. App'x 694, 716 (11th Cir. Nov. 23, 2016) ("[I]n *Nken*[ *v. Holder*, 556 U.S. 418 (2009)], the Supreme Court told us removal from the United States [after entry of a removal order] is not categorically irreparable because removed petitioners 'who prevail [in a petition for review] can be afforded effective relief by facilitation of their return.' 556 U.S. 418, 435. But . . . it is implicit in this rule that removal *does* constitute irreparable harm when facilitation of a removed petitioner's return will *not* be possible." (emphasis in original)).

Even if the government instead removes Petitioner to Venezuela, he faces serious harm there, too. G.M.G. fled Venezuela for the very purpose of escaping persecution there, and has a pending asylum case on that basis. Specifically, G.M.G. was repeatedly detained and threatened by state police in Venezuela, and he fears persecution or torture on the basis of his perceived political opposition by the Venezuelan government and TdA. *See* Fuchs Decl. ¶ 3. And returning to Venezuela labeled as a gang member by the U.S. government only increases the danger, as they

will face heightened scrutiny from Venezuela's security agency, and possibly even violence from rivals of TdA. *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-3 (Hanson Decl.) ¶ 28.

Not only does Petitioner face grave harm, thus far the government has tried to execute removals without any due process. *See Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 172 (D.D.C. 2021) (irreparable harm where plaintiffs "face the threat of removal prior to receiving any of the protections the immigration laws provide"), *aff'd in part and rev'd in part*, 27 F.4th 718 (D.C Cir. 2022). Although the Supreme Court has now made clear that meaningful notice is required under the AEA, *J.G.G.*, 145 S. Ct. at 1006, Respondents take the position that they may provide English-only, plainly inadequate notice on a Friday night and execute removal—without a removal order—within 12 hours unless a designated individual has counsel available to file a habeas petition while the Court is closed. *See* Cisneros Decl. ¶¶ 11-12. As such, there remains an unacceptably high risk that the government will deport individuals who are not in fact members of TdA, including Petitioner.

III.    **The Balance of Equities and Public Interest Weigh Decidedly in Favor of a Temporary Restraining Order.**

The balance of equities and public interest merge in cases against the government. *See Nken v. Holder*, 556 U.S. 418, 436 (2009). Here, the balance overwhelmingly favors Petitioner. The public has a critical interest in preventing wrongful removals, especially where it could mean a lifetime sentence in a notorious foreign prison. *See Nken*, 556 U.S. at 436; *see also D.V.D.*, 2025 WL 1142968, at *23 (where "the Court has found it likely that these deportations have or will be wrongfully executed and that there has at least been no opportunity for Plaintiffs to demonstrate the substantial harms they might face[, t]he Court finds that these circumstances countervail the public's normal and meaningful 'interest in prompt execution.'" (quoting *Nken*, 556 U.S. at 436)).

That is especially so given the government's position that it will not obtain the release of individuals mistakenly sent to the notorious Salvadoran prison. *Supra*.

Petitioner does not contest Respondents' ability to prosecute criminal offenses, detain noncitizens, and remove noncitizens under the immigration laws. *Cf. J.G.G.*, 2025 WL 914682, at *30 (Henderson, J., concurring) ("The Executive remains free to take TdA members off the streets and keep them in detention[, and] can also deport alleged members of TdA under the INA[.]"). Thus, Respondents cannot show how the government's interests overcome irreparable injury to Petitioner.

## IV. The All Writs Act Confers Broad Power to Preserve the Integrity of Court Proceedings.

In addition to this Court's equitable powers, this is a textbook case for use of the All Writs Act ("AWA"), which provides courts a powerful tool to "maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels." *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966); 28 U.S.C. § 1651(a); *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 273 (1942) ("a federal court may avail itself of all auxiliary writs as aids in the performance of its duties. . . to achieve the ends of justice entrusted to it"); *J.A.V. v. Trump*, No. 1:25-CV-072, 2025 WL 1064009, at *1 (S.D. Tex. Apr. 9, 2025) ("A federal court has the power under the All Writs Act to issue injunctive orders in a case even before the court's jurisdiction has been established."). If Petitioner is illegally sent to a foreign country, and El Salvador assumes jurisdiction, the government will argue, as it already has, that this Court will no longer has jurisdiction to remedy the unlawful use of the AEA. *See* Resp. to Order to Show Cause, *J.G.G.*, No. 25-cv-766-JEB (D.D.C. Mar. 25, 2025), ECF No. 58 at 12 (government asserting "once the flights were outside the United States, the President did not need to rely on that Proclamation or Act to justify transferring members of a designated foreign terrorist group to a foreign country");

Resp. to Plfs.' Mot. for Additional Relief, *Abrego Garcia v. Noem*, No. 8:25-cv-951-PX (D. Md. Apr. 13, 2025), ECF No. 65 at 3-4 (government arguing that "[t]he federal courts have no authority to direct the Executive Branch to . . . engage with a foreign sovereign in a given manner," to facilitate return of wrongfully deported individual).

Whereas a traditional TRO requires a party to state a claim, an injunction based on the AWA requires only that a party identify a threat to the integrity of an ongoing or prospective proceeding, or of a past order or judgment. *See ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978) (court may enjoin "conduct which, left unchecked, would have . . . the practical effect of diminishing the court's power to bring the litigation to a natural conclusion"); *In Re: Nat'l Football League Players Concussion Injury Litigation*, 923 F.3d 96, 109 (3d Cir. 2019) ("[U]nder the All Writs Act, action is authorized to the extent it is 'necessary or appropriate' to enforce a Court's prior orders. . . Or, as this Court has explained it, there is authority under the Act to issue an injunction where such relief is 'necessary, or perhaps merely helpful.'") (citing 28 U.S.C. § 1651 and *Pittsburgh-Des Moines Steel Co. v. United Steelworkers of Am., AFL-CIO*, 633 F.2d 302, 307 (3d Cir. 1980)). Courts have explicitly relied upon the AWA in order to prevent even a risk that a respondent's actions will diminish the court's capacity to adjudicate claims before it. *See Michael v. INS*, 48 F.3d 657, 664 (2d Cir. 1995) (staying an order of deportation "in order to safeguard the court's appellate jurisdiction" and preserve its ability to hear subsequent appeals by the petitioner).

## V.    The Court Should Not Require Petitioner to Provide Security.

The Court should not require a bond under Fed. R. Civ. P. 65. There is "ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction." *Int'l Assoc. of Machinists and*

*Aerospace Workers v. Eastern Airlines*, 925 F.2d 6, 9 (1st Cir. 1991). Thus, courts have waived the bond requirement where it would pose a hardship on petitioners and unduly restrict the federal right at issue. *See, e.g.*, *da Silva Medeiros v. Martin*, 458 F. Supp. 3d 122, 130 (D.R.I. 2020); *Pineda v. Skinner Services, Inc.*, 22 F.4th 47, 57 (1st Cir. 2021) (concluding that district court did not abuse its discretion when it did not require low-wage laborers to post a bond); *D.V.D.*, 2025 WL 1142968, at *25 (waiving bond for class of noncitizens challenging unlawful removals).

## CONCLUSION

The Court should grant a TRO as to Petitioner.

Dated: May 5, 2025

Respectfully submitted,

<u>*s/ Sonja L. Deyoe*</u>
Sonja L. Deyoe (#6301)
Cooperating Counsel,
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF RHODE
ISLAND
395 Smith Street
Providence, RI 02908
(401) 864-5877
SLD@the-straight-shooter.com

Lee Gelernt*
Daniel Galindo*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
E: lgelernt@aclu.org
E: dgalindo@aclu.org

Lynette Labinger (#1645)
Cooperating Counsel,
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF RHODE
ISLAND
128 Dorrance Street, Box 710
Providence, RI 02903
(401) 465-9565
LL@labingerlaw.com

My Khanh Ngo*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
T: (415) 343-0770
E: mngo@aclu.org

Attorneys for Petitioner-Plaintiff

*\*Pro hac vice applications
forthcoming*