Case No. 1:25-cv-01163-CNS    Document 52    filed 05/06/25    USDC Colorado    pg 1
Case 1:25-cv-00195-MRD-PAS    Document 25-1    Filed 05/07/25    Page 1 of 25 PageID
#: 115

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:25-cv-01163-CNS

D.B.U. and R.M.M., on behalf of themselves and others similarly situated,

      Petitioners-Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States:
PAMELA BONDI, Attorney General of the United States, in her official capacity;
KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity;
U.S. DEPARTMENT OF HOMELAND SECURITY;
TODD LYONS, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity;
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT;
MARCO RUBIO, Secretary of State, in his official capacity;
U.S. STATE DEPARTMENT;
ROBERT GAUDIAN, Director of the Denver Field Office for U.S. Immigration and Customs Enforcement, in his official capacity; and
DAWN CEJA, Warden, Denver Contract Detention Facility, in her official capacity,

      Respondents-Defendants.

---

# ORDER

---

      Petitioners-Plaintiffs are civil immigration detainees who fear imminent transfer from this judicial district and removal without adequate notice. Their fear is premised on the President's use of the Alien Enemies Act (the Act) to remove noncitizens from the United States.

Fearing imminent risk of removal pursuant to President Donald J. Trump's March 14, 2025, Proclamation designating Tren de Aragua (TdA) a "Foreign Terrorist Organization," *see* Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 Fed. Reg. 13,033 (Mar. 14, 2025), Petitioners filed their Class Petition for Writ of Habeas Corpus and Class Complaint for Declaratory and Injunctive Relief, ECF No. 1. Petitioners concurrently filed their Emergency Motion for Temporary Restraining Order, ECF No. 2, which the Court granted on April 22, 2025. *See generally D.B.U. v. Trump*, No. 1:25-cv-01163-CNS, --- F. Supp. 3d ----, 2025 WL 1163530 (D. Colo. Apr. 22, 2025). In its TRO order, the Court provisionally certified the class Petitioners seek to represent, and ordered that:

> Petitioners and members of the provisionally certified class shall not be transferred outside the District of Colorado. The Court orders the following regarding the notice Respondents and the government must provide Petitioners and the provisionally certified class of individuals they seek to represent: Respondents shall provide a twenty-one (21) day notice to individuals detained pursuant to the Act and Proclamation. Such notice must state the government intends to remove individuals pursuant to the Act and Proclamation. It must also provide notice of a right to seek judicial review, and inform individuals they may consult an attorney regarding their detainment and the government's intent to remove them. Such notice must be written in a language the individual understands.

*D.B.U.*, 2025 WL 1163530, at *1. The Court also instructed Petitioners to file their preliminary injunction motion by April 25, 2025. *See id.* at *14. On April 29, 2025, the Tenth Circuit denied Respondents' emergency motion for a stay pending appeal of the Court's temporary restraining order on the grounds that Respondents failed to meet their irreparable harm burden. *See D.B.U. v. Trump*, No. 25-1164, 2025 WL 1233583, at *1 (10th Cir. Apr. 29, 2025).

Before the Court is Petitioners' Motion for Preliminary Injunction. ECF No. 45. For the following reasons, the Court GRANTS Petitioners' preliminary injunction motion. In granting Petitioners' motion, the Court presumes a reader's familiarity with this case's legal, factual, and procedural background set forth in the Court's TRO order, as well as the Court's May 6, 2025 order granting Petitioners' Motion for Class Certification *See D.B.U.*, 2025 WL 1163530, at *1–4; ECF No. 51.

## I.    LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy." *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 797 (10th Cir. 2019) (quotation omitted). To prevail on a preliminary injunction motion, movants must show: "(1) they are 'likely to succeed on the merits,' (2) they are 'likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in [their] favor,' and (4) 'an injunction is in the public interest.'" *M.G. through Garcia v. Armijo*, 117 F.4th 1230, 1238 (10th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). The final two factors "merge" when the government "is the opposing party." *Denver Homeless Out Loud v. Denver, Colorado*, 32 F.4th 1259, 1278 (10th Cir. 2022) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "An injunction can issue only if each factor is established." *Denver Homeless*, 32 F.4th at 1278 (citing *Winter*, 555 U.S. at 23–24).

## II.    ANALYSIS

The parties' preliminary injunction arguments echo loudly those made in support of—and resistance to—Petitioners' temporary restraining order request. *See also Nellson*

Case No. 1:25-cv-01163-CNS    Document 52    filed 05/06/25    USDC Colorado    pg 4
Case 1:25-cv-00195-MRD-PAS    Document 25-1    Filed 05/07/25    Page 4 of 25 PageID
#: 118

*v. Barnhart*, 454 F. Supp. 3d 1087, 1091 (D. Colo. 2020. The Court addresses them and, when instructive, refers to analyses in its April 22, 2025, TRO order.

### A. Threshold Issues

Respondents advance several threshold arguments—e.g., that Petitioners lack standing and the Court has no jurisdiction to review the Proclamation. *See, e.g.,* ECF No. 48 at 7. The Court addresses—and rejects—these arguments in turn.

#### i.    Standing

Respondents argue, as they did in opposing Petitioners' TRO motion, that Petitioners lack Article III standing. *See* ECF No. 48 at 8; *id.* at 16. According to Respondents, Petitioners are not under an "actual and imminent" threat because "they are [not] subject [to] the President's Proclamation." *Id.*; *cf.* ECF No. 45 at 9. The Court disagrees. For substantially the same reasons the Court rejected Respondents' standing arguments in its TRO order, it does so again. *See D.B.U.*, 2025 WL 1163530, at *6. At bottom, Petitioners have met their Article III standing burden because "there is a 'substantial risk that the harm' of being subject to the Proclamation will arise—despite [Petitioners'] current designation as individuals who do not fall under it." *Id.* (quoting *Susan B. Anthony v. Driehaus*, 573 U.S. 149, 158 (2014)); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." (citation omitted)); ECF No. 45 at 9–10; ECF No. 49 at 2.

Case No. 1:25-cv-01163-CNS    Document 52    filed 05/06/25    USDC Colorado    pg 5
Case 1:25-cv-00195-MRD-PAS    Document 25-1    Filed 05/07/25    Page 5 of 25 PageID
#: 119

To the extent Respondents mount a new standing argument, it is that Petitioners cannot claim injury by Respondents' notice policy because they "have already filed a habeas claim and any notice policy therefore cannot cause them harm." ECF No. 48 at 8. Of course, Respondents have a point—Petitioners have obviously filed this habeas challenge in federal court. *See generally* ECF No. 1. But as Petitioners observe, their habeas challenge is not merely about the notice to which they are entitled as a due process matter. *See* ECF No. 49 at 3. They also challenge "threshold issues like the Proclamation's failure to satisfy the [Act's] statutory predicates." *Id.* This challenge presents a live case and controversy under Article III. *See Murthy v. Missouri*, 603 U.S. 43, 56 (2024) ("Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'"); *id.* ("Federal courts can only review statutes and executive actions when necessary 'to redress or *prevent actual or imminently* threatened injury to persons caused by ... *official violation of law.*'") (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 492 (2009)) (emphases added); *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("It must be alleged that the plaintiff has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged statute or official conduct." (quotations omitted)); *Blum v. Yaretsky*, 457 U.S. 991, 1000 (1982) ("Of course, [o]ne does not have to await *the consummation of threatened injury* to obtain preventive relief." (quotations omitted) (emphasis added)). This is particularly true where, as here, Petitioners seek *injunctive* relief. *See Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 889 (11th Cir. 2023) ("For purposes of the concrete injury analysis under Article III, we

Case No. 1:25-cv-01163-CNS    Document 52    filed 05/06/25    USDC Colorado    pg 6
Case 1:25-cv-00195-MRD-PAS    Document 25-1    Filed 05/07/25    Page 6 of 25 PageID
#: 120

have recognized three kinds of harm [including] a 'material risk of future harm' when a plaintiff is seeking injunctive relief." (citation omitted)).

Thus, Petitioners have standing to mount their habeas claims, both for themselves and, as explained further in the Court's class certification order, on a class basis. *See Rector v. City & Cnty. of Denver*, 348 F.3d 935, 949–50 (10th Cir. 2003).

   ii.    *Presidential Power & Political Questions*

Respondents' broad argument the Court lacks jurisdiction to "review the President's Proclamation" rests on two premises: the President's authority "under [the Act] is not a proper subject of judicial scrutiny," ECF No. 48 at 9, and the "political questions doctrine" likewise bars judicial review of the Proclamation, *id.* at 11. These are flawed premises from which Respondents' unpersuasive argument proceeds. The Court considers them in turn.

   a.  *Presidential Power*

According to Respondents, federal courts cannot issue "injunction[s] purporting to supervise the President's performance of his duties," including his exercise of power and authority under the Act. ECF No. 48 at 9; *see also id.* at 17 ("[T]he [Act] grants the President virtually *unreviewable* discretion . . . .") (emphasis added). But this argument runs afoul of the separation-of-power principles Respondents purport to value. Granting Petitioners injunctive relief does not amount to "enjoin[ing] the President's exercise authority under Article II." *Id.* Judicial review of the Proclamation and Act is a proper exercise of federal courts' authority. *See, e.g., Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the

law is."); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) ("'[I]nterpret[ing] the laws, in the last resort,' [is] a 'solemn duty" of the Judiciary.") (quoting *United States v. Dickson*, 15 Pet. 141, 162 (1841)). Federal courts and judicial review are a feature—not a defect—of this Nation's constitutional structure. *See* U.S. Const. art. III, § 1; *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd*., 561 U.S. 477, 483 (2010) ("Our Constitution divided the powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial." (quotations omitted)). And simply because federal courts issue rulings unfavorable to the government is no basis, standing alone, to dispute their constitutional authority or power. *See Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 951 (1983) ("The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted."). Especially in a case such as this that hinges on statutory interpretation of the Act—a power of judicial authority the United States Supreme Court has both endorsed and exercised itself. *See Trump v. J. G. G.*, 604 U.S. ----, 145 S. Ct. 1003, 1006 (2025) ("[A]n individual subject to detention and removal under that statute is entitled to judicial review as to questions of interpretation and constitutionality of the Act." (quotations omitted)).

Respondents argue that the Court lacks the ability to "scrutinize" the President's "authority and discretion" under the Act. ECF No. 48 at 9. In their efforts to seek distance from this centuries-old legal authority, Respondents misinterpret it. *See also* ECF No. 45 at 11. For example, in *Ludecke v. Watkins* the Supreme Court "construed" the Act in its analysis of the President's assertion of "power under the Act." 335 U.S. 160, 170 (1948);

Case No. 1:25-cv-01163-CNS    Document 52    filed 05/06/25    USDC Colorado    pg 8
Case 1:25-cv-00195-MRD-PAS    Document 25-1    Filed 05/07/25    Page 8 of 25 PageID
#: 122

*see also id.* ("This brings us to the final question. Is the statute valid as we have construed it?"). Other courts have done the same. *See, e.g., Citizens Protective League v. Clark*, 155 F.2d 290, 294 (D.C. Cir. 1946) ("The one question, whether the individual involved is or is not an alien enemy, is admitted by the Attorney General to be open to *judicial determination*.") (emphasis added); *J.A.V.*, 2025 WL 1257450, at *8 ("In those decisions [including *Ludecke*], however, the Supreme Court also identified issues related to the AEA that *are* subject to adjudication."); *U.S. ex rel. Kessler v. Watkins*, 163 F.3d 140, 143 (2d Cir. 1947). At the expense of repeating itself, the Court rejected this argument in its TRO order and does so again. *D.B.U.*, 2025 WL 1163530, at *7. ("Decades old decisional law dooms Respondents' argument—to say nothing of the Supreme Court's per curiam opinion [in *J. G. G.*] issued earlier this month."). At bottom, efforts to recharacterize what Petitioners seek—judicial review of the Proclamation and Act—as somehow an unconstitutional infringement on Presidential authority—telling the President what to do— are unpersuasive. *See J.A.V.*, 2025 WL 1257450, at *8; *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *21 (D.C. Cir. Mar. 26, 2025) ("A TRO directing military deployments or maneuvers certainly would raise profound separation of powers questions warranting the most careful consideration and remediation. But nothing remotely like that happened here.") (Millett, J., concurring).

b. *Political Questions*

Respondents next assert that "whether the [Act's] preconditions are satisfied" is an unreviewable political question. ECF No. 48 at 10. Nonsense. Courts—including this one—have rejected this meritless argument, and the Court declines to indulge it further.

8

*See, e.g., J.G.G. v. Trump*, No. CV 25-766 (JEB), --- F. Supp. 3d ----, 2025 WL 890401, at *9 (D.D.C. Mar. 24, 2025) ("To the degree that a claim requires the court to interpret a statutory provision or decide a law's constitutionality, the political-question doctrine is not implicated: deciding such questions 'is a familiar judicial exercise.'") (citing *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012)); *J.A.V.*, 2025 WL 1257450, at *10 ("It is true that the Constitution ascribes authority and responsibility for foreign policy and national security to the Legislative and Executive branches . . . . But construing the language of the [Act] does not require courts to adjudicate the wisdom of the President's foreign policy and national security decisions."); *D.B.U.*, 2025 WL 1163530, at *7; *Loper Bright*, 603 U.S. 369 at 401 ("The judiciary is the final authority on issues of statutory construction." (quotations and alterations omitted)). And Respondents' recitation of *descriptive* legal propositions does not bear the weight of their meritless argument. *Cf. Baker v. Carr*, 369 U.S. 186, 217 (1962); *J.A.V.*, 2025 WL 1257450, at *10; ECF No. 45 at 13–14.

\* \* \*

Respondents' arguments are threadbare costumes for their core contention: "As for whether the Act's preconditions are satisfied, that is the President's call alone; the federal courts do not have a role to play." ECF No. 48 at 12. This sentence staggers. It is wrong as a matter of law and attempts to read an entire provision out of the Constitution. *See* U.S. Const. art. III, § 1. The Court declines Respondents' invitation to engage in such a revisionist exercise. *See Comm. for Nuclear Resp., Inc. v. Seaborg*, 463 F.2d 788, 793 (D.C. Cir. 1971) ("An essential ingredient of our rule of law is the authority of the courts

Case No. 1:25-cv-01163-CNS    Document 52    filed 05/06/25    USDC Colorado    pg 10
Case 1:25-cv-00195-MRD-PAS    Document 125    Filed 05/07/25    Page 10 of 25 PageID
#: 124

to determine whether an executive official or agency has complied with the Constitution and with the mandates of Congress which define and limit the authority of the executive. Any claim to executive absolutism cannot override the duty of the court to assure that an official has not exceeded his charter or flouted the legislative will."); *Morrison v. Olson*, 487 U.S. 654, 699 (1988) ("The allocation of power among Congress, the President, and the courts [is] in such fashion as to preserve the equilibrium the Constitution sought to establish—so that 'a gradual concentration of the several powers in the same department' . . . can effectively be resisted.") (Scalia, J., dissenting) (quoting Federalist No. 51 at 321 (J. Madison)); *A.A.R.P.*, 145 S. Ct. 1034 ("Both the Executive and the Judiciary have *an obligation to follow the law*.") (Alito, J., dissenting) (emphasis added).

For this reason and those set forth above, Respondents err in arguing the Court lacks jurisdiction over Petitioners' habeas claims.

### iii.    Remaining Jurisdictional Arguments

Respondents advance a few more jurisdictional arguments. *See, e.g.,* ECF No. 12. The Court addresses them briefly.

### a.  Convention Against Torture

First, according to Respondents, the Court is "without jurisdiction to consider" Petitioners' Convention Against Torture arguments. Petitioners disagree. ECF No. 49 at 4, 27. *J.A.V.* considered a virtually identical argument and concluded "it does not possess jurisdiction to consider [p]etitioners' challenges to the Proclamation based on the Convention." 2025 WL 1257450, at *19. The Court finds *J.A.V.*'s thorough analysis of this issue persuasive, and agrees with its conclusion that the Court lacks jurisdiction to

Case No. 1:25-cv-01163-CNS    Document 52    filed 05/06/25    USDC Colorado    pg 11
Case 1:25-cv-00195-MRD-PAS    Document 251    Filed 05/07/25    Page 11 of 25 PageID
#: 125

consider Petitioners' challenges to the Proclamation based on the Convention Against
Torture. *See id.* (collecting and discussing cases); *Kapoor v. DeMarco*, 132 F.4th 595,
608 (2d Cir. 2025) ("By its explicit reference to both 28 U.S.C. § 2241 and 'any other
habeas corpus provision,' Section 1252(a)(4) plainly bars habeas review of [Convention]
claims." (citation omitted)).

### b. Enjoining Petitioners' Transfers

Second, Respondents argue the Court lacks jurisdiction to "enjoin the transfer of
Petitioners or putative class members outside of" the District of Colorado. ECF No. 48 at
14. That is not so. Respondents cite legal authority regarding executive power and judicial
limitations in the distinguishable context of the Immigration and Nationality Act and Title
8. *See, e.g., id.* However, Petitioners observe they are not "challeng[ing] discretionary
actions that the [these] provisions are meant to shield from review." ECF No. 49 at 10.
Indeed, as the Court's temporary restraining order made clear, provisions in the
Immigration and Nationality Act and Title 8 do not "reach so far as to prohibit judicial
review 'as to questions of interpretation and constitutionality' of the Act simply because
any case, putative class or class member, or petitioner may implicate or also be involved
in Title 8 immigration proceedings." *D.B.U.*, 2025 WL 1163530, at *8 (quoting *J. G. G.*,
2025 WL 1024097, at *1. "Petitioners, through habeas, challenge removal proceedings
under the Proclamation and Act, implicating the place of their detention only to the extent
necessary to adjudicate their habeas claims." *Id.* (citations omitted); *id.* at *13. And if there
was any doubt the Court may enjoin inter-district transfers of individuals detained
pursuant to the Act and Proclamation, the Supreme Court's decision in *A.A.R.P* dispels

Case No. 1:25-cv-01163-CNS    Document 52    filed 05/06/25    USDC Colorado    pg 12
Case 1:25-cv-00195-MRD-PAS    Document 125    Filed 05/07/25    Page 12 of 25 PageID
#: 126

it. *A.A.R.P. v. Trump*, 145 S. Ct. 1034 (2025). *See also J.A.V.*, 2025 WL 125740, at *20 (issuing permanent injunction barring respondents from "detaining, *transferring*, or removing [petitioners], and members of the certified class" (emphasis added)); *see also J.A.V.*, 2025 WL 1257450, at *18 (concluding at summary judgment stage that "Respondents do not possess the lawful authority under the [Act], and based on the Proclamation, to detain Venezuelan aliens, *transfer them within the United States*, or remove them from the country") (emphasis added).

The Court pauses, however, to state the obvious: Nothing in the Court's TRO order, or in the preliminary injunction it issues here, prohibits Respondents from deporting or removing individuals under the immigration authority they cite. *See J.G.G. v. Trump*, 2025 WL 914682, at *30 ("The Executive remains free to take TdA members off the streets and keep them in detention. The Executive can also deport alleged members of TdA under the INA . . .") (Millett, J., concurring); *J.G.G. v. Trump*, 2025 WL 890401, at *1 ("[N]either Order prevented the Government from deporting anyone—including Plaintiffs—through authorities *other than* the Proclamation, such as the INA."); *D.B.U.*, 2025 WL 1163530, at *13 ("Respondents are not prohibited, should a TRO issue, from proceeding to deport and remove individuals under the INA *at all*."). Rather, the Court has jurisdiction to enjoin Respondents from transferring Petitioners and class members out of this judicial district where those transfers are based on the Act and Proclamation. *See, e.g., A.A.R.P.*, 145 S. Ct. 1034. To again state the obvious: The Act and Proclamation are distinct from the Immigration and Nationality Act and Title 8. Respondents are wrong to conflate them.

*c. Habeas Jurisdiction*

Finally, Respondents argue the Court cannot exercise jurisdiction over Petitioners' claims under 28 U.S.C. § 2241. ECF No. 48 at 16. All that's old is new again. The Court rejected this argument in its TRO order and does so again for the same reasons. *See D.B.U.*, 2025 WL 1163530, at *5–6.

\* \* \*

Respondent's remaining jurisdictional arguments—that the Court lacks authority for judicial review under Title 8, cannot enjoin transfers to other judicial districts, and lacks § 2241 jurisdiction—may, as the Court's analysis above indicates, sound familiar. They are. So too, for this reason, will the Court's response to them. *See, e.g., D.B.U.*, 2025 WL 1163530, at *9. As discussed above, consistent with the Court's analysis in its TRO order, these arguments fail, and do not stop the Court from proceeding, as it will now, in its merits analysis of Petitioners' preliminary injunction motion.

**B.  Preliminary Injunction**

Having addressed these arguments, the Court now considers whether Petitioners have met their preliminary injunction burden. *See M.G.*, 117 F.4th at 1238. Explained below, they have.

*i.    Likelihood of Success on the Merits*

To hear Respondents tell it, Petitioners cannot meet their "likelihood of success" burden because "[t]he Proclamation comports with the [Act's] statutory requirements." ECF No. 48 at 17. *See also* 50 U.S.C. § 21. Petitioners disagree, contending the Proclamation does not meet the Act's preconditions. *See, e.g.,* ECF No. 45 at 9, 17. The

Court parses these requirements—which Respondents acknowledge are *requirements*—in turn. *See* ECF No. 48 at 17.

> a.  *"Invasion," "Predatory Incursion," and*
> *"Foreign Nation or Government"*

**Invasion.** According to Respondents, the President determined TdA is "perpetuating an invasion *or* predatory incursion" in the United States. ECF No. 48 at 17. In making this argument, Respondents read the word "invasion" as broadly including a "hostile entrance," or "hostile encroachment," *id.* This argument and the authority marshalled in support of it are unpersuasive.

The Court previously considered the "definitional and historic registers" against which "invasion" and "predatory incursion" may be interpreted under the Act. *D.B.U.*, 2025 WL 1163530, at *9. There is no reason to disturb its conclusion that the word "invasion" as used in the Act "contemplate[s] military action." *Id.* at *10; *cf.* ECF No. 48 at 17. "The term 'invasion' was a legal term of art with a well-defined meaning at the Founding." *J.G.G.*, 2025 WL 914682, at *8  (Henderson, J., concurring); *see also id*. (defining "invasion as a "'[h]ostile entrance upon the right or possessions of another; hostile encroachment,' such as when 'William the Conqueror invaded England'") (quoting Samuel Johnson, Invasion, sense 1, A DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773)); (reciting second dictionary defining "invasion as a "'hostile entrance into the possession of another; particularly the entrance of a *hostile army* into a country for the purpose of conquest or plunder, or the attack of a military force'") (quoting Noah Webster, Invasion, sense 1, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)) (emphasis added).

Case No. 1:25-cv-01163-CNS    Document 52    filed 05/06/25    USDC Colorado    pg 15
Case 1:25-cv-00195-MRD-PAS    Document 51    Filed 05/07/25    Page 15 of 25 PageID
#: 129

At least one other court has subsequently confronted the question Respondents pose—what does "invasion" mean?—and rejected virtually identical arguments now advanced by Respondents in their instant opposition. *See J.A.V.*, 2025 WL 1257450, at *15 ("[N]umerous sources contemporaneous to the enactment of the [Act] [are sources] in which 'invasion' and 'predatory incursion' expressly reference or imply military action."). The Court finds *J.A.V.*'s analysis persuasive and adopts it, bolstering its prior conclusion in the TRO order that "invasion" demands military action. *See* D.B.U., 2025 WL 1163530, at *10. And as to the *same definition* Respondents cite here—that "invasion" merely means "hostile entrance"—*J.A.V.* did not equivocate: "Respondents identify no other historical records supporting their proposed meaning of 'invasion,' and they offer no sources from the nation's founding era as to the ordinary meaning of 'predatory incursion.'" *Id.* The Court finds Respondents' briefing here likewise lacking.

Accordingly, the Court agrees with Petitioners—consistent with Founding-era definitions and historical sources, including those cited in Petitioners' preliminary injunction motion—that the word "invasion" as used in the Act "contemplate[s] military action." *D.B.U.*, 2025 WL 1163530, at *10 (citations omitted); *J.A.V.*, 2025 WL 1257450, at *16 ("The historical records that the parties present, supplemented by the additional records that the Court reviewed, demonstrate that at the time of the [Act's] enactment, the plain, ordinary meaning of 'invasion' was an entry into the nation's territory by a *military force* or an organized, armed force, with the purpose of conquering or obtaining control over territory.") (emphasis added); ECF No. 45 at 18–21.

*Predatory Incursion.* Respondents argue the phrase "predatory incursion" as used in the Act "encompasses (1) an entry into the United States (2) for purposes contrary to the interests or laws of the United States." ECF No. 48 at 18. Would that it was so—or that cases decided centuries after the Act was enacted support Respondents' homespun definition of "predatory invasion." *See, e.g., id.* (citing *Amaya v. Stanolind Oil & Gas Co.,* 62 F. Supp. 181, 189–90 (S.D. Tex. 1945)). Once again, Respondents distort language and the relevant historical backdrop against which the Court must interpret it. *See, e.g., Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018) ("[O]ur job is to interpret the words consistent with their ordinary meaning . . . at the time Congress enacted the statute." (quotations omitted)); *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 784 (2020) ("The ordinary meaning that counts is the ordinary public meaning *at the time of enactment*.") (Kavanaugh, J., dissenting) (emphasis added). And considering the controlling historical definitions and sources, *see id.*, the Court agrees with Petitioners and other courts—consistent with its TRO order—that "predatory invasion" demands more. *See, e.g., D.B.U.*, 2025 WL 1163530, at *10; *Ludecke*, 335 U.S. at 170 n.13, 68 S.Ct. 1429 ("[T]he life of [the] statute is defined by *the existence of a war*.") (emphasis added); *J.A.V.*, 2025 WL 1257450, at *16 ("[T]he common usage of "predatory incursion" . . . referenced a military force or an organized, armed force entering a territory to destroy property, plunder, and harm individuals, with a subsequent retreat from that territory. Although other uses exist for these terms, those rare uses do not represent the *ordinary meaning of those terms*.") (emphasis added); *J.G.G.*, 2025 WL 914682, at *10 ("Like its statutory counterparts, predatory incursion referred to a form of hostilities against the

16

Case No. 1:25-cv-01163-CNS    Document 52    filed 05/06/25    USDC Colorado    pg 17
Case 1:25-cv-00195-MRD-PAS    Document 51    Filed 05/07/25    Page 17 of 25 PageID
#: 131

United States by another nation-state, a form of attack short of war.") (Henderson, J.,
concurring); ECF No. 45 at 21.

*Foreign Nation or Government.* Respondents argue TdA qualifies as a "foreign
nation or government" under the Act because "TdA's infiltration of key elements of the
Venezuelan state make it indistinguishable from Venezuela," and TdA operates as a
"governing authority in the areas where it operates." ECF No. 48 at 19–20. In doing so,
Respondents acknowledge TdA is a "nonstate actor[,]" and that TdA "itself is [not] itself a
'nation.'" *Id.* at 21.

This acknowledgment starts and stops the Court's discussion of what "foreign
nation" or "government" mean under the Act. The Court need not plunge into the historical
record to reject Respondents' argument, *cf.* ECF No. 45 at 22, or further define "foreign
nation" or "government" in order to resolve the issues presented by Petitioners'
preliminary injunction motion. Particularly where "[t]he Proclamation does not find TdA
*itself* is a foreign nation, country, or government." *D.B.U.*, 2025 WL 1163530, at *11;
*J.A.V.*, 2025 WL 1257450, at *17 ("[T]he Proclamation declares that the country of
Venezuela, through Maduro, directs and controls TdA's activities in the United States.");
*id.* ("[T]he Court finds that the Proclamation places the government of Venezuela as the
controlling entity over TdA's activities in the United States."). Accordingly, the Court
agrees with *J.A.V.* that "[a]lthough the Proclamation focuses on TdA's activities in the
United States, it places *control* of those activities in Maduro, acting in his claimed role of
President of Venezuela." 2025 WL 1257450, at *17 (emphasis added); *see also D.B.U.*,

2025 WL 1163530 ("[T]he Proclamation fails to adequately find or assert TdA is 'a foreign nation or government.'") (citing § 21); ECF No. 45 at 23.

The Court makes one observation. Of course the President is "entitled to examine the available evidence" and make a final determination as to whether an organization or entity constitutes a "foreign nation or government" that has invaded or taken a predatory incursion against the United States. ECF No. 48 at 21. In this vein, the Court agrees with *J.A.V.* that "[o]nce a court defines the parameters of what conduct constitutes an 'invasion' or 'predatory incursion' for purposes of the [Act], the court leaves to the Executive Branch the determination of whether such conduct has been perpetrated, attempted, or threatened." 2025 WL 1257450, at *10. But this does not immunize Respondents—or the Proclamation—from judicial scrutiny. "[A] Presidential declaration invoking the [Act] must include sufficient factual statements or refer to other pronouncements that enable a court to determine whether the alleged conduct satisfies the conditions that support the invocation of the statute." *Id.* at *11. And—consistent with legal authority discussed in the Court's earlier analysis of presidential power and political questions—the Court must determine "whether the factual statements in the Proclamation, taken as true, describe an 'invasion' or 'predatory incursion' for purposes of the [Act]." *J.A.V.*, 2025 WL 1257450, at *18.

Having considered historical definitions of the Act's language and attendant historical records, the Court determines that Petitioners are likely to succeed on the merits of their claim that the President's invocation of the Act "through the Proclamation exceeds the scope of the statute" and is therefore unlawful. *Id.*; *see also D.B.U.*, 2025 WL

Case No. 1:25-cv-01163-CNS    Document 52    filed 05/06/25    USDC Colorado    pg 19
Case 1:25-cv-00195-MRD-PAS    Document 51    Filed 05/07/25    Page 19 of 25 PageID
#: 133

1163530, at *11 ("[E]fforts to cramp the Proclamation's findings into [the Act's] historical meaning fail."); *J.G.G.*, 2025 WL 914682, at *24 ("But once those [Executive] decisions are made, determining whether the political answer falls within the meaning of a statutory term is the job of the Judicial Branch.") (Millett, J., concurring). Thus, Petitioners have met their burden under the "likelihood of success" factor based on their argument that the Act does not sustain the Proclamation.

### b. Summary Notice and Removal

Respondents argue the Act's notice procedures comply with due process, and that for this independent reason Petitioners are unlikely to succeed on the merits of their habeas claims. *See* ECF No. 48 at 22; *cf.* ECF No. 45 at 15. The Court disagrees.

Respondents rally various legal authorities, citing both the Act and Immigration and Nationality Act, to arrive at their fundamental conclusion: "[I]f 24 hours suffices to satisfy due process for someone who may resided in the United States for two years, then surely it is sufficient for those who have been designated enemies of the nation by the Commander in Chief." ECF No. 48 at 24. This argument deflects. The relevant due process inquiry trains on whether, in this factual context, notice to detainees under the Act is provided "in such a manner as will allow them to actually seek habeas relief in the proper venue before [their] removal occurs." *J. G. G.*, 145 S. Ct. at 1006. Exercise of executive discretion as to whether—or what—process is required runs headlong into *J. G. G.* and bedrock due process principles. *See, e.g., Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 ("An elementary and fundamental requirement of due process . . . is notice reasonably calculated, under all the circumstances, to apprise interested

Case No. 1:25-cv-01163-CNS    Document 52    filed 05/06/25    USDC Colorado    pg 20
Case 1:25-cv-00195-MRD-PAS    Document 125    Filed 05/07/25    Page 20 of 25 PageID
#: 134

parties of the pendency of the action and afford them an opportunity to present their objections." (citations omitted)); *Boumediene v. Bush*, 553 U.S. 723, 780 (2008) ("[T]he common-law habeas court's role was most extensive in cases of pretrial and noncriminal detention, where there had been little or no previous judicial review of the cause for detention."); *D.B.U.*, 2025 WL 1163530, at *12 ("[W]hen 'notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.'") (quoting *Mullane*, 339 U.S. at 315). Accordingly, Respondents fail to persuade their proposed notice procedures under the Act are proper. *Compare* ECF No. 48 at 22, *with* ECF No. 45 at 15.

Despite this, Respondents make a well-taken point: Petitioners D.B.U. and R.M.M. have filed this habeas action, and thus any notice policy "cannot cause them harm." ECF No. 45 at 8; *see also id.* at 25. But although Petitioners have filed this habeas action, as explained in the Court's standing analysis they remain subject to the possibility of being deported under the Act, rather than Title 8 immigration proceedings. This is not the straightforward case where Petitioners are categorically foreclosed from ever receiving deficient notice as to their possible removal under the Act and Proclamation—Respondents admitted on April 21, 2025, during oral argument that Petitioners could still be deported under the Act and Proclamation. *See also* ECF No. 45 at 10. Moreover, class members still face the possibility of deportation under the Act and Proclamation, or some class members have at least been designated as TdA members and informed they are removable—and will be removed—under the Act and Proclamation. *See J.A.V.*, 2025 WL

Case No. 1:25-cv-01163-CNS    Document 52    filed 05/06/25    USDC Colorado    pg 21
Case 1:25-cv-00195-MRD-PAS    Document 51    Filed 05/07/25    Page 21 of 25 PageID
#: 135

1257450, at *12 (observing that while named petitioners "possess[ed] no actual injury from any deficiencies in the notice procedures" that "[t]he same cannot be said for class members").

Now at the preliminary injunction, rather than the temporary restraining order, stage of litigation, the Court must balance the notice Petitioners and class members are entitled to as a matter of due process against Petitioners' likelihood of success on their habeas claims. Put differently, where—as here—there is a likelihood that application of the Act to class members through the Proclamation is unlawful. For this reason, there is little need to provide notice under it. Notice is hardly necessary when the deportation or removal proceeding about which it notifies a class member is unlawful. *See J.A.V.*, 2025 WL 1257450, at *18 (concluding at summary judgment phase that "Respondents do not possess the lawful authority under the [Act], and based on the Proclamation, to detain Venezuelan aliens, transfer them within the United States, or remove them from the country").

* * *

As explained above, because the Proclamation relies on the Act, and the Proclamation exceeds the scope of the Act, Petitioners are likely to succeed on the merits of their claims. *D.B.U.*, 2025 WL 1163530, at *9 ("[T]he Act cannot sustain the Proclamation." (citation omitted)). Given this, there is no need for Respondents to provide notice of class members' deportations under the Proclamation *at all*, because Respondents are enjoined from deporting anyone under the Proclamation and the Act. Accordingly, the Court lifts its April 22, 2025, order that Respondents provide Petitioners

Case No. 1:25-cv-01163-CNS    Document 52    filed 05/06/25    USDC Colorado    pg 22
Case 1:25-cv-00195-MRD-PAS    Document 51    Filed 05/07/25    Page 22 of 25 PageID
#: 136

and class members of removal proceedings under the Act, because Respondents—at this stage—cannot deport or remove any class member under the Act. *See, e.g., Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1030 (9th Cir. 1985). For this reason, the Court declines Petitioners' invitation to expand its previously ordered notice requirement. *See* ECF No. 45 at 16; 35.

   ii.  *Irreparable Harm*

  Respondent's essential "irreparable harm" argument is that Petitioners face no irreparable harm because they are currently in removal proceedings under Title 8, not the Act and Proclamation. ECF No. 48 at 28. However, as explained in the Court's TRO order, they remain at a "significant risk" of summary removal under the Proclamation. *D.B.U.*, 2025 WL 1163530, at *12; *see id.* ("Title 8 proceedings do not *eliminate* the risk of irreparable harm that Petitioners would or could be, at any moment, set for deportation and removal under the Act and Proclamation."). And some class members—at a minimum—are certainly at risk of removal under the Act, rather than Title 8.

  Further, Petitioners have now adduced evidence demonstrating the harm they and class members face should they be deported under the Proclamation. *See, e.g.,* ECF No. 45 at 30; ECF No. 45-5 at 6, 10; ECF No. 45-6. For example, that detention conditions in El Salvador's Terrorism Confinement Center (CECOT), create a tremendous risk of extreme physical harm. This evidence is sufficient to meet Petitioners' irreparable harm burden, and Respondents' scant briefing on the issue—limited to Petitioners' *current* status as engaged in Title 8 removal proceedings—fail to persuade otherwise. *See, e.g.*, *J.G.G.*, 2025 WL 890401, at *16 ("Needless to say, the risk of torture, beatings, and even

Case No. 1:25-cv-01163-CNS    Document 52    filed 05/06/25    USDC Colorado    pg 23
Case 1:25-cv-00195-MRD-PAS    Document 125    Filed 05/07/25    Page 23 of 25 PageID
#: 137

death clearly and unequivocally supports a finding of irreparable harm." (citations omitted)); *J. G. G.*, Trump v. J. G. G., 145 S. Ct. 1003, 1010–11 (Sotomayor, J., dissenting). Thus, Petitioners have met their "irreparable harm" preliminary injunction burden. *See M.G.*, 117 F.4th at 1238.

### iii.    Balanced Equities and Public Interest

Respondents' "equities and public interest" arguments are easily summarized: Granting an injunction would "irreparably harm" the President's national security and foreign policy interests, resulting in the government's inability to "negotiate on critical foreign affairs and national security matters in the future." ECF No. 48 at 28–29. On the other hand, Petitioners argue the public has a strong interest in preventing wrongful removals—particularly where those removals, as here, expose Petitioners and class members to harmful conditions—and any contrary assertion of harm is undercut by Respondents' ability to prosecute and remove noncitizens under Title 8. *See* ECF No. 45 at 32.

The Court agrees with Petitioners that these merged factors favor them and the class. The Court addressed virtually identical arguments in its TRO order, and Respondents have not persuaded the Court's analysis in its TRO order should not apply now, when the parties advance substantially similar arguments. *See, e.g., D.B.U.*, 2025 WL 1163530, at *13 ("Ensuring compliance with a pre-existing requirement imposed by the Supreme Court and Constitution, without limiting any powers under an entirely different statutory regime that permits deportations and removals, does not rise to a level of 'harm' that outbalances the harm Petitioners face absent the issuance of a TRO in this

case at this stage." (citations omitted)). This is acutely true at this stage of litigation, where Petitioners have adduced evidence demonstrating the harms they face should they be deported under the Proclamation, *see, e.g.,* ECF No. 45-6, and where Petitioners have met their burden of showing a likelihood of success in showing the Proclamation, and proceedings under it, exceeds the scope of the Act.

* * *

After considering all preliminary injunction factors and the parties' arguments attendant to them, Petitioners have met their burden of showing they are entitled to preliminary injunctive relief. *See Denver Homeless*, 32 F.4th at 1278 ("An injunction can issue only if each factor is established." (citation omitted)). Fundamentally, the Court concludes R.M.M. and R.B.U. face a sufficient risk of wrongful and harmful deportation under the Act and Proclamation, and that other class members certainly do as well. *See also J.A.V.*, 2025 WL 1257450, at *19.

### III.    CONCLUSION

Consistent with the above analysis, and the Court's authority under Federal Rule of Civil Procedure 65, Petitioners' Motion for Preliminary Injunction is GRANTED. ECF No. 45. Respondents are enjoined from detaining, transferring, or removing Petitioners and members of the certified class under the Act based on the Proclamation from the District of Colorado. Petitioners are not ordered at this time to issue a security or bond, as determined by the Court in the exercise of its discretion. The terms of this preliminary injunction do not apply to the President.

Case No. 1:25-cv-01163-CNS    Document 52    filed 05/06/25    USDC Colorado    pg 25
Case 1:25-cv-00195-MRD-PAS    Document 125    Filed 05/07/25    Page 25 of 25 PageID
#: 139

DATED this 6th day of May 2025.

BY THE COURT:

Charlotte N. Sweeney
United States District Judge